UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )
Rigoberto S.J.,                     )   File No. 26-cv-957
                                    )            (LMP/JFD)
          Petitioner,               )
                                    )
vs.                                 )   St. Paul, Minnesota
                                    )   February 18, 2026
Pamela Bondi, Attorney              )   2:01 p.m.
General; Kristi Noem,               )
Secretary, U.S. Department of       )
Homeland Security; Todd M.          )
Lyons, Acting Director of           )
Immigration and Customs             )
Enforcement; David Easterwood,      )
Acting Director, St. Paul           )
Field Office Immigration and        )
Customs Enforcement; and            )
Warden ERO El Paso Camp East        )
Montana, El Paso, Texas;            )
                                    )
          Respondents.              )
------------------------------------------------------------

BEFORE THE HONORABLE LAURA M. PROVINZINO
UNITED STATES DISTRICT COURT JUDGE

**(SHOW CAUSE HEARING VIA ZOOM)**

Proceedings recorded by mechanical stenography; transcript produced by computer.

ERIN D. DROST, RMR-CRR
(651) 848-1227

Appellate Case: 26-1327   Page: 1   Date Filed: 03/11/2026 Entry ID: 5617236

APPEARANCES VIA ZOOM

For the Petitioner:      Zimmer Law Group LLC
ERIN LINS, ESQ.
155 Wabasha Street South
Suite 100
St. Paul, Minnesota 55107

For the Respondents:    United States Attorney's Office
DAVID W. FULLER, AUSA
MATTHEW ISIHARA, SAUSA
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

Court Reporter:       ERIN D. DROST, RMR-CRR
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

**I N D E X**

PAGE

**SCOTT LADWIG**
Examination by the Court      49

ERIN D. DROST, RMR-CRR
(651) 848-1227

Appellate Case: 26-1327    Page: 3    Date Filed: 03/11/2026 Entry ID: 5617236

**P R O C E E D I N G S**

**IN OPEN COURT**

**(VIA ZOOM)**

THE COURT:  All right.  Good afternoon.

We are here in the matter of Rigoberto S.J. v. Pamela Bondi, Attorney General; Kristi Noem, Secretary, U.S. Department of Homeland Security; Todd M. Lyons, Acting Director of Immigration and Customs Enforcement; David Easterwood, Acting Director, St. Paul Field Office Immigration and Customs Enforcement; and the Warden of ERO El Paso Camp East Montana in El Paso, Texas.

It's Civil Case 26-957.  It's been assigned to me, along with Magistrate Judge John Docherty.

So before we start with the show cause hearing, I'll first ask for appearances on behalf of the petitioner.

MS. LINS:  Good afternoon, Your Honor.  Erin Lins on behalf of the petitioner.

THE COURT:  Good afternoon.

And on behalf of the respondents?

MR. FULLER:  Good afternoon, Your Honor.  This is David Fuller, Assistant U.S. Attorney, and I'm currently serving as the civil chief in our office, on behalf of the respondents.

And we also have Matt Isihara.

Appellate Case: 26-1327     Page: 4     Date Filed: 03/11/2026 Entry ID: 5617236

Matt, did you want to say hello?

MR. ISIHARA:  Yes, Your Honor.  Matt Isihara, Special Assistant United States Attorney, for the respondents as well.

THE COURT:  Great.  Welcome to both of you.

This is -- we are using Zoom today both for some efficiencies -- it looks like we may have participation in people outside the district -- but because it is on Zoom, we still have to follow our federal court practice.

There can be no recording or broadcast of this particular Zoom hearing.

There is a transcript being made, so I just mention that because there will be a record of it, but also so we're not speaking over each other.

So for this show cause hearing, I think I'll do a little bit of table setting, and then I'll probably ask Ms. Lins to speak to her efforts after my February 9th order was issued in order to get compliance with it.

So I -- part of this hearing today is to see if I do need to issue a contempt sanction.  I need to understand what happened here.  I'm -- it's very troubling, in the Court's review of this record, including the filings by Ms. Lins yesterday and today, I see at least three clear violations of my February 9th order.

First, I see that petitioner was released in Texas

Appellate Case: 26-1327    Page: 5    Date Filed: 03/11/2026 Entry ID: 5617236

and not in Minnesota, albeit he was released on February 12th in Texas, but he was supposed to have been released by no later than February 13th in Minnesota. That release in Texas caused him to have to stay in a shelter overnight, to find his own place to stay, and for his attorney to then be able to find a flight back for him the following day. So I'm very concerned about that first violation.

Secondly, the February 9th order was clear that petitioner was to be released with all of his property and without conditions. Based on the communication filed yesterday from the petitioner's counsel, the petitioner was released without any of his identification documents. So that still is a clear area of noncompliance that we need to address today.

Third, that February 9th order, in addition to requiring release on February 13th in Minnesota, ordered the Government to provide a status update certifying their compliance by February 17th. That deadline has now come and gone without any response -- frankly, no response from the Government at all in this case file. That prompted, obviously, petitioner's counsel to alert me to it and to set this show cause hearing for today.

So, first, Ms. Lins, what I've tried to figure out is sort of who the people are in the chain that are

potentially people I can hold in contempt for this noncompliance. Thank you for filing those e-mail communications today, but it would be helpful for you to walk the Court through efforts that you've taken since February 9th and my order was issued.

MS. LINS: Certainly, Your Honor.

So the first thing that I did was on February 11th, I e-mailed the El Paso Outreach e-mail box, which is kind of the -- the general e-mail box for the El Paso ERO ICE Field Office, and I sent them a courtesy copy of the order in this case because I understood that the client was in Texas, he was going to need to be transported to Minnesota, and I wanted to ensure that he was going to be released on time in Minnesota. And I noted in the body of the e-mail that he -- the order stated he needed to be released in Minnesota with his belongings. And, like I said, I attached it.

And then he was subsequently released the following day, which was a timely release --

THE COURT: And, Ms. Lins, did you get -- I just see that e-mail as your Exhibit 1. Did you receive any response from the El Paso Outreach e-mail to that communication?

MS. LINS: I did not, Your Honor.

THE COURT: Okay. Thank you. I'll let you go

Appellate Case: 26-1327     Page: 7     Date Filed: 03/11/2026 Entry ID: 5617236

ahead on the second exhibit.

MS. LINS: Thank you, Your Honor.

The following day I was -- I learned from my client that he had been released, which was timely, per the order, a day prior to the deadline, but he was released in El Paso.

And immediately upon learning that, because he was sort of unsure what to do and where to go and was unprepared, I first e-mailed the two individuals in the second e-mail, which were the ICE El Paso -- I believe one is the field office director and I believe the other is the assistant field office director. And I, as the Court can see in the exhibit, asked how to rectify the situation and noted that it was not in compliance with the order. And I did not receive a response to that.

Immediately --

THE COURT: And this is to Joel Garcia and Adam Molina?

MS. LINS: Yes. And I'm not sure of Adam Molina's title, to be honest.

THE COURT: How did you know to communicate with them?

MS. LINS: Because there was a resource sheet shared among the immigration bar with different contact points for El Paso, given that there are a lot of Minnesota

Appellate Case: 26-1327    Page: 8    Date Filed: 03/11/2026 Entry ID: 5617236

detainees there, and different points of communication that we could try to assist in any issues that would arise with our clients' cases.

THE COURT: Okay. So I see Exhibit 2 is your February 12 e-mail. So I understand this is after you learned from Mr. S.J. he'd been released in Texas and you send it to two representatives of the field office there.

Did you receive any response or have you received any response to that e-mail?

MS. LINS: I have not.

THE COURT: Okay. Anything more about your attempts to communicate with El Paso? Have you received any communication from those efforts?

MS. LINS: I have not.

THE COURT: Was your client able to identify any representatives of ICE or others that he would have encountered in his, you know, outprocessing, in his release? Anything that he was able to communicate with you as it relates to people who may have been involved in the release or may have maintained his identification documents?

MS. LINS: I have not heard of any specific names, Your Honor, but to be transparent with the Court, I haven't asked him if he had any specific names either other than the people that I've reached out to.

THE COURT: Okay. Fair. Thank you for that.

Appellate Case: 26-1327     Page: 9     Date Filed: 03/11/2026 Entry ID: 5617236

All right. And I will let you continue with, I guess, your communications with the U.S. Attorney's Office here.

MS. LINS: Yes. And in kind of that exact same time frame, I e-mailed the U.S. Attorney's Office. And I had e-mailed originally to Trevor Brown, who I had communicated with on other cases and has been very responsive and helpful, just to see if he happened to be on the matter or could share with me the contact of the attorney that was assigned to this case. And he promptly did so, I think within minutes.

And then I waited a little bit to see if Mr. Isihara responded, given that he was looped in, and then followed up later that afternoon and received a reply that he would -- had other pressing matters and would circle back.

And in the interim, you know, my client needed a place to go, and so we started to move forward with figuring out how to get him home. He stayed in the shelter, and then he made it back to Minnesota the following day, that Friday. And then I learned that he had not received his property, and so I wrote again on Monday, which was the 16th, regarding the property issue.

And it was -- it was definitely my intent and hope that this would and could be resolved short of this hearing.

I have to zealously advocate for my client, and at this point, I'm just not sure how to resolve these issues. I believe that the release issue -- obviously, he's back in Minnesota -- there's no way to remedy that, although I do believe that that was a clear violation and they were notified. And the property issue continues to be outstanding at this moment.

THE COURT: That was what I was going to ask. Do you know what the status of the property is? I take it from what you've just said, your client does not have the property. The petitioner --

MS. LINS: He does not have -- correct, Your Honor, he does not have the property. And prior to this hearing, around noon or so, I spoke with both Mr. Fuller and Mr. Isihara, who indicated that they are trying to communicate or are in communications with ERO regarding the release of the property, and that was ongoing, to identify where the property is and how it can be released, is my understanding.

THE COURT: Okay. So just to be clear, is the Exhibit 3 sort of the sum total of your written communication with the U.S. Attorney's Office spanning February 12th to February 16th of this year?

MS. LINS: Yes, Your Honor.

THE COURT: Okay. And at the point in time you

Appellate Case: 26-1327     Page: 11     Date Filed: 03/11/2026 Entry ID: 5617236

reached out to Trevor Brown -- it sounds like he's an AUSA you'd had previous dealings with?

MS. LINS: That's correct, Your Honor.

THE COURT: And then he promptly connected you with "Special Assistant U.S. Attorney Matt Isihara" -- and I'm reading from the exhibit -- "who is assigned to this case," and then --

MS. LINS: Yes.

THE COURT: -- directed you to connect with him and that he would address it?

MS. LINS: Yes. And then he -- he cc'd Mr. Isihara so we became connected on the e-mail chain from there.

THE COURT: Okay. And you, at that point in time, on Thursday, February 12th, at 2:43, put Mr. Isihara on notice that your "client continues to be in El Paso and does not currently have a way to Minnesota. I would like to resolve this before the status update to the Court is due"?

MS. LINS: Correct, Your Honor.

THE COURT: And is the only response you received just a few minutes later from Matthew Isihara, dated 2:45 p.m. on Thursday, February 12th, saying, "Let me get back to you in a bit. I have a few urgent matters I need to close the loop on. I'll circle back with you later this afternoon"?

MS. LINS:  Correct, Your Honor.

THE COURT:  Okay.  And based on what I see in this exhibit, there was no further circling back or communication from Mr. Isihara?

MS. LINS:  Not until this morning, Your Honor.

THE COURT:  Okay.  Anything else you want to say on behalf of your client or on behalf of this record?

MS. LINS:  No, Your Honor.  Thank you.

THE COURT:  Great.  Thank you.

Mr. Fuller, I don't know if I should turn it over to you or Mr. Isihara.  Who were you planning to have speak on behalf of the communication -- I guess there are a few different pieces, and we may also need a witness here.

MR. FULLER:  Yes.  And I don't -- I guess I may have neglected to introduce someone from the -- from the Government's side.  I limited it to the U.S. Attorney's Office earlier, but I believe that Scott Ladwig is also with us.  I'm not seeing an image, but he, I believe, is the deputy field office director locally here for Immigration and Customs Enforcement.

THE COURT:  Okay.

MR. FULLER:  Mr. Ladwig, are you with us?

MR. LADWIG:  Yes, sir, I am.

Good afternoon, Your Honor.  I am a deputy field office director for ERO-New Orleans.  I'm on detail up here

Appellate Case: 26-1327    Page: 13    Date Filed: 03/11/2026 Entry ID: 5617236

in Minnesota. I'm functioning as the deputy director for Operation Metro Surge specifically in the area of logistics, which is why I've been asked to -- to join this -- this hearing.

THE COURT: Great.

When were you first made aware of this specific case, of Mr. Rigoberto S.J.'s situation?

MR. FULLER: Your Honor, if it's all right, I would -- I just wanted to make sure that he was introduced, and if it's okay, maybe I would -- I would just speak first.

THE COURT: That would be great. I'll have you speak first, and then if we need to, we can swear in the witness.

MR. FULLER: Oh, yeah. And I'm not sure that Mr. Ladwig is prepared to testify. I don't know how much personal direct knowledge he has about any of this.

THE COURT: Okay.

MR. FULLER: We've been --

THE COURT: Well, I did --

MR. FULLER: -- we've been making efforts, but I -- yes. So --

THE COURT: I understand that. But, Mr. Fuller, my order yesterday said there needed to be "a representative (or representatives) of Immigration and Customs Enforcement who had notice of the Court's February 9th Order and is

Appellate Case: 26-1327    Page: 14    Date Filed: 03/11/2026 Entry ID: 5617236

responsible for Petitioner's custody, property, and release."

Do we have such a person on the Zoom hearing today?

MR. FULLER: No, we do not. My understanding is that Mr. Ladwig and others from the local office have made a number of efforts since the Court's order yesterday to find such a person, and Mr. Ladwig is here to kind of explain his understanding of what he's been able to figure out at this point.

And so we did consider asking to postpone this hearing, but I advised that we should not do that. I had thought, even up to a couple of hours ago, that we might have someone from Texas who had been directly involved available, but that was -- we haven't heard back. We're in a somewhat similar position to plaintiff's counsel -- or petitioner's counsel, unfortunately.

THE COURT: Okay. Well, why don't you first walk me through -- you just heard Ms. Lins, petitioner's counsel, walk through all of the efforts that she has undertaken, both with ICE in El Paso along with the U.S. Attorney's Office, to get compliance. I'll have you respond to sort of her recounting of the evidence and tell me if there's anything within these e-mails or this communication that you're disputing.

MR. FULLER: Yeah. And I am not aware of any dispute on the evidence.

I will just say, we take this very seriously. This is an extremely unfortunate thing that happened in this case. I'm certainly aware that it's not the only instance of violations taking place in immigration habeas matters in this district in recent weeks.

Mr. Isihara is an example of our office attempting to beef up our staff and try to handle all of the many, many cases that have come -- come in the door in recent weeks. He is one of the two JAG -- Army JAG Special Assistant U.S. Attorneys that have been working extremely hard on these cases, and Matt has done a really good job. We're very pleased to have him with us. He's been in the office about a month, and there have been extremely few instances of this kind of thing happening.

We've been working hard to improve our operations. For example, just this week, we received three additional paralegals to help with things of -- such as keeping track of court orders and deadlines and communicating -- you know, making needed communications to the agency.

There certainly was a downfall in this case, and I just want to represent on behalf of the office sincere regret, and that any of those failings were absolutely inadvertent, including on Mr. Isihara's part.

THE COURT: I appreciate the acknowledgment of regret, Mr. Fuller, but it's really hard for me to say this is inadvertent when I see a response from Mr. Isihara on February 12th saying, "Let me get back to you in a bit. I have a few urgent matters I need to close the loop on. I'll circle back with you later this afternoon."

I see nothing in this record indicating he ever responded to Ms. Lins; I see nothing in this record indicating an attempt to help the petitioner get back to Minnesota as I ordered; I see nothing in this record that would suggest compliance with the order that all of his property be returned; nor do I see any filing related to certification of compliance, even if that means we are making efforts to reach out to ICE to get this information.

So how can you say this is inadvertent? And do you believe this is a satisfactory response on behalf of your office?

MR. FULLER: I certainly do not believe it's satisfactory, and that's part of what I meant when I said that we take this very seriously and we -- we greatly regret what happened here.

I do think that, at a certain level, this matter fell through the cracks. And when I say it's inadvertent, I think it's an example of we have simply had too many matters and not enough staff to keep up with what's been happening.

Appellate Case: 26-1327    Page: 17    Date Filed: 03/11/2026 Entry ID: 5617236

And Mr. Isihara can speak more to the details of what happened here and how this may have come about, but it is -- it did take place, I would say, on the heels of another, you know, matter that has, you know, gained a fair amount of public attention where another Special Assistant U.S. Attorney ended up leaving our office around the same time as our former civil chief. And that's an example of, you know, some of the -- some of the practical problems and difficulties we've been facing.

THE COURT: No, I understand there's a huge logistical gap, but I'm dealing with one case and one petitioner who was ordered to be returned to Minnesota, released here with his documents. He was released in Texas without his property and without a place to stay. I mean, the Court is incredibly troubled by that. And no response -- I mean, really, the Government has done nothing in this case.

MR. FULLER: Yeah, I see the evidence. I see the same evidence, and I'm equally troubled. I -- that's all I can say is that I'm equally troubled.

THE COURT: It sounds like Ms. Lins said she may have had telephone communication with you at noon today. Can you provide an update as it relates to return of the petitioner's property?

MR. FULLER: That's another example of where I,

Appellate Case: 26-1327    Page: 18    Date Filed: 03/11/2026 Entry ID: 5617236

frankly, don't know much about this matter yet. I just became aware of it yesterday. And so we have preliminarily discussed this, and I've preliminarily discussed it also with Mr. Ladwig, but he'll have to fill us in on that piece. And Mr. Isihara will have to fill us in on the details of how this matter kind of unfolded within our office.

THE COURT: Okay.

MR. FULLER: I have a fairly indirect knowledge of this matter overall.

THE COURT: Okay. How do I understand, as the judge in this case, though, if -- when I look at the docket, I see Ana Voss presumably had been listed initially as the representative from the U.S. Attorney's Office. With her departure, the docket says she was terminated on February 9th of 2026. I see on the docket that you, Mr. Fuller, are the lead attorney or the attorney to be noticed.

So I'm struggling a little bit to understand how you can say you have limited to no familiarity with this case when you are the lead attorney, attorney to be noticed on the file.

MR. FULLER: Yeah. And so there's a -- an interesting agreement that the U.S. Attorney's Office, in the civil division in particular, has, I guess, with the court clerk's office when it comes to habeas matters, and

Appellate Case: 26-1327    Page: 19    Date Filed: 03/11/2026 Entry ID: 5617236

that includes both prisoner habeas and immigration habeas.

I don't know the full history of it, but essentially in these cases, we do not require the petitioners to serve in a traditional manner or according to the rules. Instead, we have agreed to accept service via e-mail. And the way that that works is that there has to be an actual lawyer from the office listed on every case. And the way we do it is that that is the civil chief.

And so, prior to her departure, Ms. Voss was listed on every single case. Those are not her cases. And especially in the early phases, she's the only lawyer. It appears as if she's involved in the case, but it's more of what you might consider a type of a ghost appearance. And then, in an ideal world, we'll have the attorney assigned to the case file a Notice of Appearance.

Now, we've been short-staffed. In this case, it was assigned to Mr. Isihara. There never had been a Notice of Appearance until, I believe, today or perhaps yesterday after this order came out. So it's --

THE COURT: To date --

MR. FULLER: -- one --

THE COURT: -- I'm looking -- I'm looking at the docket -- there's been no Notice of Appearance. I still see you listed as the lead attorney, attorney to be noticed, and Ana H. Voss terminated. To date, unless I hear otherwise, I

Appellate Case: 26-1327    Page: 20    Date Filed: 03/11/2026 Entry ID: 5617236

see no filing on behalf of the Government --

MR. FULLER:  I thought that there had --

THE COURT:  -- or Notice of Appearance.

MR. FULLER:  I thought that there had been a Notice of Appearance filed on behalf of Mr. Isihara this morning, but I could be wrong about that.  But that was our intent.

THE COURT:  Okay.  Not according to what I looked at, and I refreshed it probably 30 minutes ago.  But the order to show cause from last night is Document Entry 9, and then the filings from Ms. Lins today, her exhibits and notice, are Filing 10 and 11.  So I don't see anything yet.

I understand that's the typical practice.  Based on the e-mail communication from Ms. Lins to Trevor Brown, is that an accurate statement to say that Mr. Isihara was assigned the case as of February 12th?

MR. FULLER:  I believe that is accurate, yes.

THE COURT:  Okay.  So he'd be the person responsible at the U.S. Attorney's Office for this case from February 12th forward?

MR. FULLER:  That is correct.

THE COURT:  And what would typically happen when someone is assigned a case in terms of noting that in any way on the docket?

MR. FULLER:  Well, again, we've had -- because of

Appellate Case: 26-1327     Page: 21     Date Filed: 03/11/2026 Entry ID: 5617236

the shortage of staff in terms of paralegals, we've had a practice of there's not always a Notice of Appearance in the cases. But that attorney would be responsible for meeting the deadline to respond substantively to the petition, and then also, you know, communicating and conveying any orders to the agency for purposes of ensuring compliance and meeting deadlines, such as, follow-up reporting, status updates, and so forth, going forward, so -- and essentially handling all aspects of the case.

THE COURT: How can that happen if that attorney has not filed a Notice of Appearance in the case?

MR. FULLER: Well, I think that if someone simply files the response, that may trigger additional electronic court filing notices coming to that attorney. That's a technicality that I'm not fully aware of. It's -- with -- especially with additional paralegal support this week, we have a plan for filing a Notice of Appearance early on in every single case.

THE COURT: But at this point, I guess, I can only be reassured that the ECF filings went to you. When I click on the e-mail to attorneys and additional recipients, it also provides, I think, the LISTSERV for your civil division along with various paralegals. But as of now, you are the only attorney of record who would be receiving the court's filings.

MR. FULLER: That -- that would be correct if there has been no filing at all by Mr. Isihara, which it sounds like there hasn't been. That is correct.

THE COURT: Okay. Is there anything else you wanted to say before I invite responses from Mr. Isihara?

MR. FULLER: No. That was it for now.

THE COURT: Okay. Great. Thank you, Mr. Fuller.

All right. Mr. Isihara, we have met before in court, and I recall telling you it was really important for the Government to file responses to status updates because that's the way the Court can get some reassurance of whether there's been compliance or not and the way the Court can understand what steps have to next happen.

I guess I need to figure out a few things from you. First, is it fair that you became the attorney of record or the assigned attorney on this case as of February 12th?

MR. ISIHARA: Your Honor, I actually was assigned as the attorney before that point. So I filed the response, which was due, I believe, sometime after February 2nd in this case. I was originally assigned, based on e-mail traffic, I think, on February 2nd as the attorney on the case, and I had filed a timely response when that -- when that filing was due. So --

THE COURT: Are we looking at the same case file,

26-cv-957?  I see no response from you.  In fact, I entered my order clearly indicating that because the Government had failed to respond, they had waived certain arguments.

MR. ISIHARA:  That's -- that's correct, Your Honor.  My apologies.

Yeah.  So we -- we -- to be honest, Your Honor, I believe this -- this slipped through the cracks.  This was one of the cases that we had -- we had been assigned.

I -- I received e-mail traffic from our paralegal team.  And the way, sort of, procedurally this has been working is that we'll be notified about cases that we're assigned to as AUSAs or SAUSAs, and we'll have a certain period of time in which to reply.  We'll file a reply.  And depending on what the Court decides, if there is an order to grant habeas, at that point, we will -- we will forward the order to the OPLA team, who will forward it then to ERO.  So there's multiple sort of, like, channels that the information has to go through.

During the period of time in which I was initially assigned to the case, which was on February 2nd, there were an enormous volume of cases coming through.  I -- I sincerely regret the fact that I didn't forward the order when it came through.  I was, in fact, notified by our paralegal team, just in the spirit of full candor and disclosure here.

Appellate Case: 26-1327     Page: 24     Date Filed: 03/11/2026 Entry ID: 5617236

We were doing our best under the circumstances to make sure everything was forwarded, but there have been a few instances in which I have noticed that I haven't immediately filed orders. I think in the vast majority of those cases, I've circled back a few hours later and found that I didn't forward it and forwarded it and things have eventually worked themselves out.

But I think, unfortunately, this was one instance in which, to be candid, the ball was dropped and -- on my part, and I take responsibility for not forwarding the order immediately to OPLA and then the OPLA team not forwarding it to ERO. And that's -- that's sort of the sequence of events that happened here.

THE COURT: Okay. So based on what you're telling me today, you were assigned this case as of February 2nd, so that was the date the emergency petition was filed; is that accurate?

MR. ISIHARA: Yes.

THE COURT: Okay.

MR. ISIHARA: Yes, Your Honor.

THE COURT: And I entered my order to show cause directing a response by February 5th. That day came and went without any response from you on behalf of the Government; is that correct?

MR. ISIHARA: That is, I believe, correct,

Your Honor, if that's what the record says.

THE COURT: And then it was petitioner's counsel who reached out and provided a letter to the Court indicating that the Government had not met the briefing date, asking for an order. I entered the order on the 9th.

Is it true you did nothing to respond to the letter from petitioner or my order on February 9th?

MR. ISIHARA: Yes. I don't -- I don't believe I forwarded the order, which we would normally do, to OPLA. That would be -- that would have been the next steps. That did not occur.

THE COURT: Okay. So I understand an order from a Court would normally go to OPLA so it can actually get enforced, meaning the petitioner can be released and all conditions of the Court's order can be followed.

You mentioned that the paralegal team provided my February 9th order to you. I assume that was through e-mail?

MR. ISIHARA: Through e-mail. And I was provided individualized notice from one of our paralegals that this was -- this had been sent to us and to send it to OPLA. I think it came in around -- if my notes are correct, around 8:45 a.m. on the 10th is when I got that, and -- the notice from our paralegals, and I did not subsequently send that to OPLA.

Appellate Case: 26-1327    Page: 26    Date Filed: 03/11/2026 Entry ID: 5617236

THE COURT: Okay. So you took no affirmative steps after being alerted by your paralegal team of my February 9th order; is that correct?

MR. ISIHARA: That's correct, Your Honor.

THE COURT: Okay. Did the paralegal team provide my order to OPLA?

MR. ISIHARA: Not to my knowledge, no.

THE COURT: Okay. So the order was entered, and the U.S. Attorney's Office did nothing with it?

MR. ISIHARA: I can't speak to any other individual members of the U.S. Attorney's Office, but I can say that I didn't take any further steps after, I guess, being put on notice about it.

THE COURT: Okay. So that was clear that the release had to happen in Minnesota by February 13th. So then you get communication from Ms. Lins by way of Trevor Brown connecting you. Explain to me what your answer meant, "Let me get back to you in a bit. I have a few urgent matters I need to close the loop on. I'll circle back with you later this afternoon." And at that point in time, you were alerted that the petitioner had been released in Texas when my court order said he had to be released in Minnesota.

MR. ISIHARA: Your Honor, I don't -- I don't believe at the moment I -- I can't speak to what I was thinking about at that moment as far as his release is

Appellate Case: 26-1327    Page: 27    Date Filed: 03/11/2026 Entry ID: 5617236

concerned.

As far as my response to her, I was planning on looking into the situation after I had finished a few filing deadlines that afternoon or that morning, depending on when the timing of the e-mail was.  We do oftentimes have 11:00 -- 11:00 a.m. or noon filings, so I was probably multitasking and trying to finish those as expeditiously as possible.  And then I would circle back to the opposing counsel, try to reach out to her and solve the matter as quickly as possible.

I mean, our goal here is ultimately to ensure that the Court's orders are followed and complied with and that our agency is -- the agency is put on notice about them.  And I -- I'm sure I was tracking it, but there are probably multiple priorities that I was trying to deal with that day and it got lost in the shuffle.  That's -- that's the honest --

THE COURT:  So I want you to walk me through in very specific detail -- from this communication at 2:45 p.m., this is Exhibit 3, when you said you have a few urgent matters you need to close the loop on.  I'll circle back with you later this afternoon, detail every step you have taken to ensure compliance with this Court's February 9th order.

MR. ISIHARA:  Your Honor, after receiving that

e-mail from Ms. Lins, I -- I think I made a note of it somewhere to get back to her, probably wrote it -- I think I wrote it down on the list. And then I honestly forgot about it until this week when I got notice that there was this show cause hearing occurring.

I immediately reached out to OPLA and forwarded them the order and told them that these are the -- these are the -- these are the provisions of the order, which include a -- a requirement that property be returned.

I let ERO know about that, and I called Ms. Lins to hopefully facilitate -- help -- to get in contact with her and hopefully help facilitate the return of the petitioner's property, which is, I believe, still the main outstanding issue in this case given the fact that he was, unfortunately, released in Texas, not Minnesota, even if it did happen within the appropriate time frame.

So I believe the last issue that's really under our control would be the property. So I have taken steps as of today, as of the 18th, to ensure the property is returned, and we are on that, and this is our absolute priority right now.

THE COURT: But if I'm hearing you correctly, after this e-mail from Ms. Lins on February 12th, you wrote it down on a list. You took no further action until my order to show cause last night.

Appellate Case: 26-1327     Page: 29     Date Filed: 03/11/2026 Entry ID: 5617236

MR. ISIHARA: I believe that's correct, Your Honor.

THE COURT: Okay. Detail everything you've done since my order to show cause was issued last evening.

MR. ISIHARA: Your Honor, I -- I sent an e-mail to the OPLA team at 9:45 a.m. this morning listing the steps that the order included. I noted -- I noted that -- I noted release. I noted release without any conditions. And I -- I, essentially, just forwarded the conditions that were included in the -- in the order to return his property to him.

I forwarded that to the OPLA e-mail address, there's a group e-mail address for OPLA, and I also cc'd David Fuller, who is present at this hearing, and one of our paralegal -- and two of our paralegals on that e-mail.

THE COURT: Okay. Who have you -- so I guess there are two outstanding noncompliance issues. First relates to the return of the petitioner's property. So detail everything you've done to ensure compliance with return of petitioner's property.

MR. ISIHARA: Yes, Your Honor. So I -- I put -- I -- via that e-mail, I put OPLA on notice. I just want to also let you know that we do have an OPLA attorney every day of the week who's now present physically at our office, so I was able to speak with that person, and I let them know

about the issue. I took responsibility for not having conveyed this information promptly and for this -- this unfortunate situation which we're now in. And I asked them to maybe assist me with looking into the -- just return of property and getting this done as soon as possible.

THE COURT: What communication have you received from OPLA as it relates to the property?

MR. ISIHARA: Of -- as of -- as of this afternoon, I have -- one moment -- I have -- I have not yet received any communication that I'm tracking right now from OPLA on the property return issue.

THE COURT: What -- what do you understand to be the status of the property? Is it in El Paso? Is it in the petitioner's A-File? Where is it?

MR. ISIHARA: Your Honor, I -- I don't have, like, personal visibility on where the property is physically located at this time.

Additionally, I did -- I was able to communicate with the OPLA attorney who is currently physically in our office. They were able to send me detention history, but I don't believe there was anything property related in that communication that I received.

THE COURT: Again, that's troubling for the Court, because the purpose of this hearing is to ensure compliance, specifically with that part of the order as it relates to

Appellate Case: 26-1327    Page: 31    Date Filed: 03/11/2026 Entry ID: 5617236

the return of the petitioner's property.  So as it stands today at 2:35, I don't have an idea of whether the property is in El Paso or whether it's at the Whipple Building.  I don't have any information as to where that property is.

Who are the people responsible as custodians of property within ICE?

MR. ISIHARA:  Your Honor, I believe that would be whichever subdivision of ERO exists at the El Paso facility.

Again, just -- just for the Court's, like, awareness, we -- we do not have direct communications with ERO.  All of our communications with ERO are facilitated through OPLA.  Generally, the U.S. Attorney's Office doesn't directly interface with ERO.

THE COURT:  Okay.  Ms. Lins did communicate with somebody named Joel Garcia and Adam Molina, who are apparently with the field office division in El Paso.  Do you know if they have access to the petitioner's property?

MR. ISIHARA:  I do not, Your Honor.

THE COURT:  Do you know what role they would have played in the release of the petitioner in Texas and the failure to return him to Minnesota?

MR. ISIHARA:  I cannot speak with any degree of accuracy on that, Your Honor.

THE COURT:  Okay.  So if I am understanding, there's sort of this black box.  So when things come to the

Appellate Case: 26-1327    Page: 32    Date Filed: 03/11/2026 Entry ID: 5617236

U.S. Attorney's Office, if things are working well, and they weren't in this case, that would go through OPLA. OPLA would direct ICE ERO to do different things.

Here we have a complete breakdown. The Government did nothing in this case, didn't even follow up by filing my -- directing my order through OPLA.

So can you direct me to any ways in which the Government has complied with my order?

MR. ISIHARA: Your Honor, as of being notified -- as of this morning, we did reach out to OPLA again at 9:45. That -- we are -- we did -- we did reach out to opposing counsel again today. We had -- we left a voicemail. And I briefly spoke with Ms. Lins today, and I believe that Mr. Fuller did speak with her as well.

We have let OPLA know about the outstanding property issue, so we have put the facilitator, I guess, the intermediary between us and ERO, on notice about the property issue.

But aside from that, I do not believe there have been any other direct communications concerning property in this case.

THE COURT: So if I --

MR. FULLER: Can I just --

THE COURT: Oh, sorry, Mr. Fuller.

MR. FULLER: Can I step in?

Appellate Case: 26-1327     Page: 33     Date Filed: 03/11/2026 Entry ID: 5617236

THE COURT: Yeah.

MR. FULLER: Okay. And I -- I cut out for about a minute and that's why I turned off my video for a bit.

But, in any event, I think that Mr. Ladwig will be able to explain a little more about the -- his understanding of the compliance efforts that --

THE COURT: Great.

MR. FULLER: -- apparently occurred in Texas and that the fact of this person being released was not unrelated to the fact that there was this court order that was shared with those people.

THE COURT: Okay.

MR. FULLER: In terms of why it happened in Texas as opposed to Minnesota, I'm not sure anyone here at this time understands why that happened --

THE COURT: Okay.

MR. FULLER: -- but there obviously was a breakdown in this case at the level of the U.S. Attorney's Office because of our people, frankly, being overwhelmed with -- with just the number of matters.

THE COURT: Okay.

MR. FULLER: That's -- that's the basic situation here.

THE COURT: Great. I appreciate that, Mr. Fuller.

Mr. Isihara, I still have a few questions for you

Appellate Case: 26-1327     Page: 34     Date Filed: 03/11/2026 Entry ID: 5617236

before I turn to Mr. Ladwig.

MR. ISIHARA: Yes, Your Honor.

THE COURT: If I needed to get to the bottom of this and find out who that intermediary is at OPLA who could help answer, I think, what steps they've taken to reach out to the right person in El Paso as it relates to the property, who would that person be or persons be?

MR. ISIHARA: Your Honor, so we traditionally in these cases were assigned an individual OPLA attorney who we'd liaise with on these cases. More recently we've been directing inquiries to the OPLA inbox, which is basically a shared mail inbox, and one of the OPLA attorneys will pick up the communication and then disseminate it forward to ERO.

At the Court's request, we could provide that e-mail contact or -- or potentially any other information. We do have one OPLA attorney who is here in our office just as a -- as a liaison, but they're not directly assigned to this case.

So it's generally my understanding that, in these cases, that we will be assigned an OPLA attorney and an OPLA attorney will then pass the information on. So it's kind of a collective pool.

THE COURT: Okay. I do need the name of the OPLA attorney assigned to this case, so if you or Mr. Fuller can get that for me before the end of the hearing.

Appellate Case: 26-1327     Page: 35     Date Filed: 03/11/2026 Entry ID: 5617236

And then you mentioned there's somebody embedded from OPLA at your office. Could I have his or her name?

MR. ISIHARA: Your Honor -- and I believe Mr. Fuller might be able to speak to this with a greater degree of accuracy, but currently our -- we have Courtney Campbell who is assigned to our office today, but, again, it's a rotating cast of OPLA attorneys who are here on a short-term basis just to facilitate communications with OPLA.

THE COURT: But it sounds like the only communication with OPLA in this record happened today at 9:45 when you sent my order and direction to find out about the status of the petitioner's property. Is that accurate, OPLA only became involved today based on your e-mail?

MR. ISIHARA: That is correct, My Honor --

THE COURT: Okay.

MR. ISIHARA: -- Your Honor.

MR. FULLER: Can I step in once again? I'm sorry.

THE COURT: No, no problem. Thank you, Mr. Fuller.

MR. FULLER: Yeah. And, again, Mr. Ladwig, I think, will be able to speak to this in a little more depth. But my understanding from what I heard earlier today is that the OPLA, which is the Office of the Principal Legal Advisor, the legal group within this agency, the group down

Appellate Case: 26-1327    Page: 36    Date Filed: 03/11/2026 Entry ID: 5617236

in Texas had -- had some awareness of this matter.  But, again, we don't know -- I don't think we know the details just yet --

THE COURT:  Okay.

MR. FULLER:  -- because this has just come to my attention and to the attention of several others --

THE COURT:  Okay.

MR. FULLER:  -- within the past day.

THE COURT:  Is it fair to say OPLA here would have just been alerted, so that would be Courtney Campbell, as of this morning, but maybe OPLA in El Paso had previous knowledge of this case?

MR. FULLER:  I believe so, except for -- I would just add that Courtney Campbell is -- just happens to be physically in our office today --

THE COURT:  Okay.

MR. FULLER:  -- and maybe yesterday, but that's -- that's a bit of a happenstance.

THE COURT:  Okay.  But that's the person who would be sort of staffing the duty inbox or assisting with issues on that day; is that correct?

MR. FULLER:  No.  The -- the -- the fact of people from that group at the agency being colocated and physically located here in the U.S. Attorney's Office is a fairly recent development, and it kind of comes and goes.  And

Appellate Case: 26-1327    Page: 37    Date Filed: 03/11/2026 Entry ID: 5617236

it's -- their job description -- their job duties are somewhat random, I'd have to say. And so they're not -- they're not the liaison. They're not the go-between.

THE COURT: Okay.

MR. FULLER: Our -- our protocol is to e-mail that inbox --

THE COURT: Okay.

MR. FULLER: -- the inbox that Mr. Isihara mentioned, and that is what should have happened in this case.

THE COURT: Okay. So that e-mail inbox would be staffed, presumably, by a duty lawyer?

MR. FULLER: My -- my sense is that that inbox is staffed by multiple agency lawyers, and --

THE COURT: Okay.

MR. FULLER: -- in fact, within the past couple of weeks, they have increased the staffing level of that inbox by ten additional attorneys who are remotely working on Minnesota-related immigration habeas cases.

THE COURT: Okay. But it sounds like you and Mr. Isihara have referenced there would have been a specific OPLA attorney assigned to this case, so that's the person's name that I'll need to get from both of you.

MR. FULLER: Yeah. And I'm not sure I'll be able to get that by the end of the hearing, but we can provide

it.

But I'll also add one point, which is, even though one of -- one of those people is assigned to a case, we often are working as teams. We are a team within the U.S. Attorney's Office. They seem to work as a team. I'll sometimes pick up the phone and just call someone, regardless of whether they're assigned to a particular case --

THE COURT: Okay.

MR. FULLER: -- just to get information and convey information.

THE COURT: Okay. That's helpful. So it sounds like what you're describing is even if your assigned OPLA attorney to the case is unavailable, you could reach out to someone else at OPLA who could assist on a case. Am I understanding that correctly?

MR. FULLER: Yes. Yes, and that's often the way it works. And even -- even, you know, though I am -- I mentioned it at the beginning, I'm making a ghost appearance and not -- it's not -- it's not really my case, I'm -- I often have, in recent weeks, found myself stepping in on matters when something becomes a little more of an emergency, a little more urgent, a little more pressing.

Obviously, this matter is extremely serious. That's why I'm here today. I'm just trying to do what I can

to help, and that's what a lot of us -- that's what all of us in some ways are doing.

THE COURT: And Mr. Ladwig has been patient. I have a few last questions for Mr. Isihara.

I guess the last remaining issue of noncompliance relates to my order for a status update as of yesterday. So can you walk me through why that has not been complied with?

MR. ISIHARA: Your Honor, basically, given the fact that we -- that I recently became aware of the situation again this morning, I was planning on getting further communication from ERO. And then once we had some further development in the property situation, property return, we would at that point provide a prompt status update as to the return of property, allowing -- giving you a timetable as to when that would occur.

THE COURT: Explain to me why you have not filed a Notice of Appearance yet in this case and why you didn't file a status update, even if it means that you're seeking additional information.

MR. ISIHARA: Your Honor, as for the Notice of Appearance issue, generally, my understanding is the paralegals automatically file that; so I think that, like -- I think something got lost somewhere in the chain of communications in this case.

Mr. Fuller did speculate earlier that when we

Appellate Case: 26-1327     Page: 40     Date Filed: 03/11/2026 Entry ID: 5617236

filed a response, that that sort of automatically triggered the appearance in the case. I think there might be -- I mean, the fact that I didn't file a response in this case and honestly lost sight of it might be the reason for that.

Again -- again, we've been trying to keep up to date on all these cases, and this is just one where that simply didn't happen, where things sort of fell through the cracks. And I -- that's all I -- that's all I really have to add on that.

As far as the status update is concerned, I think -- and my understanding of this may have -- may have been out of -- out of bounds, but my understanding was that since we did have a hearing and I became aware of it too today, that that would be probably the best point at which to update the Court on the current status of things.

And if the Court is requesting us to file a status update, we will do so immediately. But my understanding was, given that we had a hearing today, this might be the best opportunity to sort of keep -- get all parties up to speed on the current status of things in this case.

THE COURT: Okay. You can see from the Court's perspective, and clearly from petitioner's perspective, when there isn't a Notice of Appearance filed, we don't know who the appropriate person is within the U.S. Attorney's Office who should be responsive.

And so in this particular case, Ms. Lins reached out to Trevor Brown. That's an AUSA she's worked with in the past and knows. So it's very problematic when there isn't a Notice of Appearance filed. And I can recognize that can take a day or two to happen with staffing issues, but this case -- you were assigned to this case on February 2nd, so it's troubling that that hasn't happened and we're now, you know, at February 18th.

MR. ISIHARA: Understood, Your Honor.

THE COURT: So what steps will you take to make sure that happens in the future?

MR. ISIHARA: Your Honor, I believe Mr. Fuller has touched on this a bit before, but there are concrete steps being taken within the U.S. Attorney's Office to address this. I'd say there's about three steps.

So the first is the addition of three additional paralegals from ICE who are filling in to allow for greater and more accurate communications between us, OPLA, the Court, and other actors in the system.

Another would be the addition of further Special Assistant United States Attorneys. I believe some are coming in from my own agency, from the Department of War or Department of Defense, and they will be embedded in the office and handling habeas cases, I believe, within the next month or so, which will take a substantial -- substantial

Appellate Case: 26-1327    Page: 42    Date Filed: 03/11/2026 Entry ID: 5617236

workload off the current number of attorneys who are working here.

And we've also had internal conversations and sessions with paralegals and attorneys in here, you know, sort of driving home the point that we need to be very careful about orders that come out from the Court and immediately forwarding those to OPLA and ERO.

Your Honor, I just, again, want to apologize for the situation. I will say this: I did talk to our paralegal team the other day. We're trying to sort of develop greater accountability over processes and procedures.

Normally I would have a tracker system that would be tracking these things, but given the sheer number of cases that we've had -- just to -- just to give you some rough numbers, I've had anywhere between 126 and 129 cases assigned in the last month. It's been a very large volume, and it's sort of overwhelmed any -- I think any individual attorney's ability to sort of keep up with. I've tried to be as accountable as possible, but this has been -- this has been an enormous challenge and a steep learning curve.

THE COURT: Well, it's been challenging for the Court. I have a tracker system. My team and I have had to work around the clock, evenings and weekends as well, to keep up with these because these are really important cases.

Appellate Case: 26-1327    Page: 43    Date Filed: 03/11/2026 Entry ID: 5617236

And I've heard you and Mr. Fuller say it's important to follow court orders, you take this seriously. But just on a human level, Mr. Isihara, do you believe that this is acceptable that the Government has not in any way attempted to comply with the Court's orders? But, more problematically, we have a situation where a petitioner was released in Texas when he should have been released in Minnesota, and he didn't have a place to stay that night, had to stay in a shelter and, through the good graces of an attorney, was able to secure a flight home the following day.

Do you believe on a personal level that that is okay?

MR. ISIHARA: Your Honor, I -- I would just say, on a personal level, I have immense sympathy for the petitioner's situation. I think we are really regretful for any role that we played in this sort of situation evolving in the way that it did. I -- I don't -- this is not normally how things would go on our end. I'm very apologetic about it.

And, no, I don't think it's acceptable, but I also think that it needs to be looked at in light of, again, the -- sort of the situation logistically that we're dealing with on this end. I -- this -- these things do have real human consequences, and I think the fact is that the

Appellate Case: 26-1327    Page: 44    Date Filed: 03/11/2026 Entry ID: 5617236

additional support is absolutely essential to ensuring that this sort of thing doesn't happen again.

THE COURT: Well, I was a former Assistant U.S. Attorney, and we took really seriously our obligations in each case and to the Court.

I mean, do you believe -- when you look at this docket, do you believe how the Government has litigated this is up to the standards and acceptable for the U.S. Attorney's Office?

MR. ISIHARA: Your Honor, bluntly, in this case, no, and I -- I concede that I personally dropped the ball in this case.

But this is -- this has been a situation where I believe that the volume of work that we've been handling over the last few weeks has vastly exceeded the capacity of any -- any individual AUSA or SAUSA to deal with. And while we have been able in most cases to remedy situations before they reach this point, in this instance, we weren't. And I, on my end, take full responsibility for the portions I contributed to.

THE COURT: And, Mr. Isihara, last question before I turn it over to the deputy field office director, Mr. Ladwig. Why should I not hold you in contempt?

MR. ISIHARA: Your Honor, I think that to hold us in contempt would be to say that we basically acted with,

like, total indifference and there was a total deviation from the expected standard of conduct, and not only that, but that we -- we were sort of willfully defying the court orders. And I think in this case, there wasn't any willful defiance of the court orders. What we were trying to do was comply.

But we are simply, as an office, underresourced, and we are dealing with a situation that is largely the result of factors external to anybody in the U.S. Attorney's Office or anybody on the OPLA side. This is -- this is a situation that's, to be blunt, unprecedented, and that we are all doing the best that we can under the circumstances. That we're all human, that we all make mistakes, and that we're trying to do the best we can to remedy the situation.

And it's having -- this is a situation that's put enormously qualified and competent attorneys under an enormous degree of stress. The chief of our civil division, for instance, left a few weeks ago, Ana Voss. This has been a situation where people who are exceptionally talented and skilled attorneys have felt under enormous pressure.

And I don't think there was ever any intention to defy the court orders or to deviate that severely from the standard of care that we're expected as attorneys. I think we were doing our best and things, unfortunately, slipped -- slipped through the cracks.

THE COURT: And on this record, I see no effort being made by the U.S. Attorney's Office until 9:45 today.

MR. ISIHARA: Yes, that's -- there weren't any concrete, tangible steps being taken. I think that was more a matter of sort of situational awareness and our ability to track any number of ongoing situations at one time. They're sort of -- it's a capacity issue, Your Honor, and that's the fundamental underlying issue. It's not -- it's not -- it's not any willful attempt to defy the Court.

THE COURT: Okay. Thank you, Mr. Isihara.

Mr. Fuller?

MR. FULLER: And -- well, could I just add that I became aware of this matter yesterday after the order, and I -- and I was catching up on e-mails and began taking steps and making communications. And I -- I can't cite chapter and verse of every single e-mail and so forth, but -- but our office certainly became aware of this yesterday, not -- not just this morning.

THE COURT: Okay. Maybe I should ask you, since you learned of it last night, what efforts have you made to ensure compliance, I guess, specifically with return of property?

MR. FULLER: I am not aware of the status of the return of property. My -- my effort has been to try to make sure that people who need to be at this hearing are aware of

the hearing and have -- have thought about the steps that they may have taken.

And so I had communications with the local attorney team and the manager of the local attorney team, and we were able to identify Mr. Ladwig, who --

THE COURT: Okay.

MR. FULLER: -- I think he'll explain that he was able to retrieve some e-mails from their system, which I'm sure are most -- mostly, if not entirely, privileged. But he might, I think, hopefully be able to share a bit of a narrative of what we've been able to determine did happen in Texas --

THE COURT: Okay.

MR. FULLER: -- to the extent that we can. And so it's been on a short time frame, but those are the kinds of things that I've done.

THE COURT: Well, it sounds like we need to hear from you, Deputy Field Office Director Ladwig. Because you are not a lawyer and will be a witness to these proceedings, I will have the courtroom deputy swear you in.

MR. LADWIG: Yes, Your Honor.

THE COURTROOM DEPUTY: So please state your full name for the record, spelling your last name.

MR. LADWIG: Scott Ladwig, L-A-D-W-I-G.

THE COURTROOM DEPUTY: So please raise your right

Appellate Case: 26-1327     Page: 48     Date Filed: 03/11/2026 Entry ID: 5617236

hand to be sworn in.

(Witness Sworn.)

THE COURT: All right. Great. All right.

What's the right title for me to use for you? Deputy Field Office Director? Mr. Ladwig? How would you prefer I address you?

THE WITNESS: Honestly, Your Honor, I -- whatever you prefer. Scott is probably what I would prefer, but I don't know that that's -- you know, DFOD Ladwig is probably the easiest to say, I would imagine.

THE COURT: Okay. Great. We typically don't use first names in federal court, so I will call you DFOD Ladwig. Okay. Great. All right.

**(Scott Ladwig)**

**EXAMINATION**

BY THE COURT:

Q. So when did you become aware of this particular case?

A. This morning.

Q. Okay. Who made you aware of this case?

A. Our deputy chief counsel with OPLA had sent an e-mail inquiring about that. I did some research, and I was never notified until then.

Q. Okay. Who's the deputy chief counsel of OPLA that you heard from?

A. Ms. Laura Trosen.

Q. Okay. All right.

So after you got that e-mail from Laura Trosen, what steps did you take to learn about this particular case, including compliance with the Court's order down in Texas?

A. The first thing I did, Your Honor, was research my own e-mails and notifications, and I was unable to locate anything with regard to this particular case or alien.

Then I reached out to the El Paso Field Office and asked, you know, how were they contacted, because our normal protocols were not followed, as I believe Mr. Isihara and Mr. Fuller had mentioned.

Q. Okay. You said you looked through your own e-mails and notifications and found nothing. Would you typically be the point of contact here in Minnesota who would receive court orders or be the person here on the ground dealing with compliance with orders?

A. Yes, Your Honor. I -- since January 29th, I've -- this has been one of my major responsibilities here in Minnesota. I've processed approximately 512 cases, resulting in about 354 releases. And I am the ERO's first point of contact, and then I defer -- or refer the information out to the appropriate location that it needs to go to --

Q. Okay.

A. -- referred to to address the orders.

Q. And when you say the normal protocol hadn't been

Appellate Case: 26-1327    Page: 50    Date Filed: 03/11/2026 Entry ID: 5617236

followed, that's because you would have typically received an e-mail, probably on February 9th or February 10th, right after my order had issued. Is that what would typically happen?

A. I don't know about the exact timing, Your Honor, but, yes, after an order is issued, then it would -- I would be notified from our OPLA office, and --

Q. Okay.

A. -- that had not happened.

Q. Okay.

A. I did not receive notification.

Q. And so when you were talking about normal procedures not following -- being followed, that's because you didn't learn about this until today; is that right?

A. Your Honor, what I was referencing there is the whole release process was initiated by the private counsel reaching out to the El Paso Field Office instead of through me to reach out to the other field offices.

Q. Ah, okay. So you're referring to Ms. Lins, petitioner's counsel. Okay. Tell me everything you know about that, how that communication happened and who in the ERO office in El Paso would have received that communication.

A. Well, Your Honor, my understanding is exactly like Ms. Lins had mentioned earlier. She had reached out to the ERO El Paso Outreach mailbox, and then from there, I don't

know exactly what happened.  There was some chain.  It was reviewed internally, ultimately resulting to who I believed to be at the time the case -- the deportation officer assigned to the -- this person's case.

Q.  Okay.  So would -- is that the typical step, to reach out to this El Paso Outreach e-mail inbox?

A.  So, like I said, out of the 512 or so cases that I've been involved with, this is the first time that I've seen where another field office was involved and it didn't go through the local points of contact.

Q.  Okay.  Do you know if there was any response to that initial inquiry from Ms. Lins -- this is Exhibit 1 -- on February 11th to that El Paso Outreach e-mail inbox?

A.  Not to my knowledge, Your Honor.

Q.  Okay.  And from what you're telling me, this is the first time, in the 512 cases you've dealt with, where you've seen the communications go from petitioner's counsel directly to that outreach inbox?

A.  Yes, Your Honor.  This is the first time --

Q.  Okay.

A.  -- for me.

Q.  Then you said, though, there was some internal communication and a deportation officer was assigned.  What can you tell me about that?

A.  All I recall, Your Honor, is that, out of the outreach

Appellate Case: 26-1327    Page: 52    Date Filed: 03/11/2026 Entry ID: 5617236

mailbox, there's -- and, again, keep in mind that I don't really know the -- the people in El Paso, the majority of them. But there was -- that initial e-mail was forwarded to, you know, several folks, until finally it reached the deportation officer that I believe was responsible for the case.

Q. Okay. Who was that deportation officer?

A. Your Honor, I apologize. I knew it, I know it, but I don't have that in front of me.

Q. Okay. At some point after your testimony, we're going to take a break, because I'll need to give the court reporter a short minute, and so I'll ask you to make sure you get me that deportation officer's name.

THE COURT: And the same directive still goes out to Mr. Fuller and Mr. Isihara as to the specific OPLA representative assigned to this case.

BY THE COURT:

Q. Okay.

A. Okay.

Q. So at some point, there's internal communication, a deportation officer is assigned. Was that still on February 11th?

A. I apologize, Your Honor. I don't -- I didn't track the dates. I just --

Q. Okay.

Appellate Case: 26-1327    Page: 53    Date Filed: 03/11/2026 Entry ID: 5617236

A. I was trying to figure out what happened, you know, big picture, and that's --

Q. Okay. Okay. So let's fill in big picture.

Apparently on February 12th, he was released in Texas. What can you tell me about that? Who was involved in that? Why was the release in Texas rather than back in Minnesota?

A. Well, I -- I don't know, Your Honor. I -- all I can tell is they were released from Texas because that's the last -- the El Paso facility, it was the last ICE facility that they were booked into and the facility that they were released from.

As far as all the specifics -- like you had -- everyone on this call mentioned about staying at a shelter. I didn't see anything along those lines, which isn't uncommon because, you know, it's not documented in our systems step by step.

Q. Well, I mean, to be clear, ICE did not provide the shelter. It was the petitioner's attorney who worked with the petitioner to find a place. He was released in Texas by ICE without any place to go and without his property, and those were specific things in my order, that he was directed to be released in Minnesota and he was directed to be released with his property.

So can you help me understand, like, who in

El Paso was responsible for his case and for the release?

A. Well, I can -- no, I don't have that specific information.

Q. Okay.

A. I can relay who I believe was the case officer, and, like, as far as the release and the release teams, I don't know specifically how they do that.

I will say, though, that we have the safe release practices throughout the nation, and I'm testifying on my own understanding from the New Orleans Field Office and also from what I've seen while I've been here, is that if someone is released from custody and they don't have a place to go, we would reach out to, like, NGOs or places to facilitate a release like that. That's what this sounds like to me, but I don't have the specifics, Your Honor.

Q. Okay. Who would be responsible for petitioner's documents and his property?

A. So here's how I've seen similar cases progress. When we have a detainee that's transferred to another field office, we would send down their alien registration file, which would typically contain documents, if there were any, in the case. Along with that, we would transfer down their property with them when we send them to, in this case, El Paso.

Now, since we've had a large volume of cases that

Appellate Case: 26-1327    Page: 55    Date Filed: 03/11/2026 Entry ID: 5617236

have gone from El Paso then back up to Minnesota, the property could be in El Paso, which is what I think is the case, but it could also be identified down in El Paso that this person was going back to Minnesota, so they could have sent the property back up here. And, again, I was unaware of any of this until this morning --

Q. Okay.

A. -- until the initial, you know, research I did to try to find out the big picture.

Q. And I appreciate you taking those steps, but as of 3:07 today, I still do not know whether the property is in El Paso or whether it's here in Minnesota.

A. I understand, Your Honor. And I was notified about the property issue about five minutes prior to the hearing, so I will look into it. I haven't had the opportunity --

Q. Okay.

A. -- to yet.

Q. Petitioner's counsel references a Minnesota driver's license, a Minnesota instruction permit, and a Mexican consular ID card. Would those be the type of documents that would typically be included in the A-File?

A. If not in the A-File, for whatever reason it could also be in the property if whoever was processing the property at intake either didn't notice it or didn't separate it from, let's say, the gentleman's wallet. It could be one of two

Appellate Case: 26-1327    Page: 56    Date Filed: 03/11/2026 Entry ID: 5617236

places, but, yes, either -- either one of those.

Q. Is your system to figure out the location of an A-File, is that a database that is searchable? Can you search that now?

A. Yes, it's a database that's searchable. I'm on a different computer. I'm not logged in. So, no, I can't do it now, but as soon as I get back to my computer, I could.

Q. Okay. So when we take that break, I will also ask you to figure out the location of the A-File. Because my understanding is the same, that those important identification documents would be with the A-File; so if you can find out that information, we'll learn whether it's in El Paso or it's back here in Minnesota.

A. Yes, Your Honor.

Q. Okay. So I -- you've worked on 512 of these cases, so you have an understanding of these. My order was very clear. It said, "The Government is ordered to release Rigoberto S.J. from custody in Minnesota by no later than 5:00 p.m. on Friday, February 13, 2026."

So did ICE comply with that?

A. Well, since he wasn't released in Minnesota, I would say they did not -- we did not comply with the order.

Q. So who are the people I need to put on the witness stand like you in order to understand why that part of the order wasn't complied with?

A.  Your Honor, it would be the -- either the case officer or whoever directed the release of this alien in El Paso.

Q.  Okay.  And right now you don't have that answer for me?

A.  No, ma'am.  I -- not exactly.  I do know -- after the break that you mentioned --

Q.  Okay.

A.  -- I will be able to provide the Court with the person who I understand was the case officer at the time.  I don't know if she's the same person that actually directed the release or not --

Q.  Okay.

A.  -- but that -- that's what I know.

Q.  When you say "case officer," is that the deportation officer assigned to the case that you had referenced earlier?

A.  Exactly.  Yes, ma'am.

Q.  Okay.  Okay.  Great.

The -- Part C of my order said:  "The Government is ordered to release Rigoberto S.J. without imposing any conditions of release and to return all property to him."

Was that part of the order complied with?

A.  Well, again, five minutes before the hearing I'm learning that the property is missing, so I can't imagine that it was.

Q.  Okay.  Is there anything else you can tell me sort of

since you were tasked with finding out this information,
anything that can shed a light on who the people are sort of
in the chain responsible for ensuring return of property?

A.   Your Honor, as far as specific officers, no, because I
don't have visibility up here on, you know, what the release
teams look like or if it's the individual case officer.  I
don't have personal knowledge about the operations in
El Paso.

And not to deflect, you know, all responsibility
on El Paso, but, like I said, Minnesota officers, myself
included, had zero visibility on any of this until this
morning, so that's why I keep referencing down there.

Q.   Okay.  And you've told me you've dealt with 512 of these
cases.  I'm certain you're familiar that me and my
colleagues are now ordering a return of property.

So when you get that type of order, what do you do
to ensure compliance and to make sure property, including
identification documents, is returned?

A.   That's relayed as part of the release instructions to
the officers that will be effectuating the release.  I do
this not only here in Minnesota, El Paso, San Antonio,
wherever the noncitizens may be housed at and are being
released from.

Our first order of business, if they're not in
Minnesota, is to get them back to Minnesota so that we can

release them. When I send out the instructions, I say, Please return the alien, along with the A-File and all property, on the next available flight -- existing flight to Minnesota. And then the Minnesota officers, upon receiving the alien from, we'll just say El Paso, as per the release process, they go through that.

Q. Okay.

A. Sometimes aliens arrive without their property, so then we go back and have to track that down and try to, you know, make the -- that whole with the Court's order. A lot of that's beyond the local officers' control, and there's various reasons why that may happen, but we follow through on that.

Same thing, there's -- oftentimes the A-File might be in one location within -- the A-File might be in Albuquerque and the alien may be at the El Paso processing center, and it takes time to get all the stuff together. But we would, you know, again, fully comply with the court order in as timely a manner that we could.

Q. Well, it sounds like you're familiar with this process and have, in fact, complied in other cases with this type of order?

A. Yes, ma'am.

Q. I mean, on a human level, do you think this is appropriate? We have a situation where the order has not

been complied with; petitioner was released in Texas without his property, without a place to stay; his attorney had to find him a place and find him a way to get returned the following day; and we sit here five days later and we don't know -- we haven't the slightest idea where his property is.

Is this an acceptable practice on behalf of ICE?

A.  Your Honor, since you're asking for my opinion in this, it appears to me as though the officers were -- may not have fully understood the order.  And I don't know how -- they were trying to comply with the order and release timely, and they're -- a lot of steps were missing.

So -- but, like I said, that's judging off of what I've been able to drum up today.  And, I mean, typically everyone would comply to the best of their ability with the order, in my experience.

Q.  Well, and just bringing you back to that idea of compliance, because I -- I do appreciate that, and I think that generally occurs.

But that very first e-mail -- you know, Ms. Lins reached out because this was somewhat unusual.  There was an order for his release and return to Minnesota.  So not only did petitioner's attorney reach out saying, you know, I wanted to give you the heads-up because there would be this extra step of transporting him back to Minnesota, but my order was attached, which made that very clear.  So it's

Appellate Case: 26-1327     Page: 61     Date Filed: 03/11/2026 Entry ID: 5617236

hard for me to understand why there was any ambiguity or any reason for ICE to have just released him in Texas without that second step of returning him to Minnesota when it was clear both from petitioner's counsel and from my order.

Can you help me understand that?

A. Your Honor, I would love to, but I -- I wasn't involved in that thought process. And I don't know if it was a miscommunication or if there are other factors, like I said, trying to meet the deadline. Perhaps there wasn't a flight -- return flight available to Minnesota so they thought it would be -- I could speculate on a bunch of different things, but I just truly don't know the answer to your question, Your Honor.

Q. Okay. Well, I appreciate your candor and your testimony.

THE COURT: Mr. Fuller, I do have a question for you. My order to show cause yesterday directed you to provide "a representative (or representatives) of Immigration and Customs Enforcement who had notice of the Court's February 9th Order and is responsible for Petitioner's custody, property, and release."

Do you believe you've complied with that?

MR. FULLER: I have made efforts to comply, but it -- it was not possible in the time frame provided.

THE COURT: When could you comply with this?

Appellate Case: 26-1327    Page: 62    Date Filed: 03/11/2026 Entry ID: 5617236

MR. FULLER: I'm not sure. I would defer to Mr. Ladwig as to his best estimate for when we might hear back. We did talk a couple of hours before the hearing, and we had expected we would hear from someone in Texas and then we never did, so I'm not sure why.

THE COURT: Okay. It sounds like -- we're going to take a break. I want to at least give Ms. Lins an opportunity to weigh in in light of the information that's come in and the testimony today.

It sounds like Mr. Ladwig is going to do two things for me; at least find the location of the petitioner's A-File and also find out who -- the case officer or the deportation officer, who's the same person, who was assigned to this case. It sounds like that may be the person who could specifically answer questions as they relate to release and as they relate to property.

MR. FULLER: And, Your Honor, I'm not sure if the purpose of the break is in part for you to make a decision, then make an oral finding or a conclusion as to contempt, but I would appreciate the opportunity to make just, I guess, an appeal to the Court before -- before you would make that decision.

THE COURT: I will allow that. I'm going to hear from Ms. Lins first. Then, Mr. Fuller, you or Mr. Isihara can.

Appellate Case: 26-1327    Page: 63    Date Filed: 03/11/2026 Entry ID: 5617236

And then I will need to take a break, both so I can figure out what my next steps are, but also so we can give the court reporter a break.

MR. FULLER: Thank you.

THE COURT: All right. Ms. Lins, anything you want to say in light of representations made by Mr. Fuller and Mr. Isihara and the testimony you heard from the DFOD Ladwig?

MS. LINS: Thank you, Your Honor.

I just want to say, you know, I'm a very firm believer in professional courtesies, and it was not my -- my hope or wish that it would come to this point. Had I heard responses, you know, that they were looking into it or they would follow up and follow-up did occur, I'd be more than happy to be patient while that process works through.

I heard a strong theme today about the immense amount of cases and the overwhelm of the caseloads and understaffing, and I would say that so too have been immigration attorneys and attorneys filing habeas petitions, and I hear the Court as well.

And I understand, as professionals and as attorneys, we are -- we are under a huge amount of stress. And although I obviously disagree with the respondents and their interpretation of the law, I understand that the caseload has affected all parties astronomically, and we are

Appellate Case: 26-1327    Page: 64    Date Filed: 03/11/2026 Entry ID: 5617236

all human. But my client is too, and that's why I'm here today. He is not just another case that's lost in the masses. He's a human that's been very affected by this.

And I waited three days past the original Court's order for a response to the first order to show cause, understanding the workloads maybe would come in late and then it would be up to the Court whether or not to accept a late response. But there have been widespread violations over many, many cases, and I do not know how to make this right when I have tried repeatedly.

And I thank Mr. Fuller for reaching out today and for our professional conversation, but I don't know, without some sort of remedy of these issues that are occurring in other cases as well, how -- how we move forward.

And -- and I just want to highlight that, you know, all of the people behind these petitions are humans.

THE COURT: I appreciate that. I agree. I have just Mr. Rigoberto S.J.'s case in front of me. So what is it you're asking the Court to do here today?

MS. LINS: Your Honor, I would defer to the Court on the issue of contempt.

And, you know, it sounds to me like this may be an El Paso issue, and they have not complied with appearing here today. I have worked with OPLA in Minnesota, and they have been professional and prior to the surge in years past.

And so I'm not sure that it's clear where this fell through, but I do certainly want some sort of resolution to the property issue here.

And hopefully -- I understand that this is one individual's case, but the issue now can no longer be remedied of the release in Texas and all of that chaos and stress, and so that's why I also bring up, you know, forward-looking, because that has been resolved independently through -- with my client.

THE COURT: I guess the Court is confounded that, you know, a day after my order to show cause specifically identifying property, your letter, which clearly itemized the property at issue, we're at 3:20, I still have no handle on where the property is. I have no level of confidence we know where it is or what time frame it would be that we can get that back to you.

Do you have any understanding -- I heard multiple times from Government counsel they have no visibility into this. Do you have greater visibility or clarity into the property issue, which clearly is a noncompliance issue with my order?

MS. LINS: No. I -- I have no idea where the property is or how to go about -- I've tried in other cases certain channels, and I haven't been successful in those cases. I don't know where the property is or how to get it

Appellate Case: 26-1327    Page: 66    Date Filed: 03/11/2026  Entry ID: 5617236

back to the client.

THE COURT: Okay. If the -- when the property is located, my order will be that it gets FedExed to you overnight. I'm certain your contact information is on your letterhead, but I'll also direct the Government to provide the tracking number or other information as it relates to that.

MS. LINS: Thank you, Your Honor.

THE COURT: Okay. Mr. Fuller, I do want to hear from you, and then we'll take a short break.

MR. FULLER: Okay. Sure.

I just wanted to appeal to the Court's good graces and -- to the extent that there is any opportunity to exercise discretion. I'm not sure, you know, whether the exact elements of contempt may have been met here, but the U.S. Attorney's Office has been struggling and striving mightily to bring about as much compliance as we possibly can. And I understand that Judge Schiltz issued an order not long ago listing a great number of instances of noncompliance.

Morale is one of the issues that has caused us difficulty, frankly, in getting additional help. And it has caused us to lose some of the help that we have had, and that has been good help. It -- you know, these people are human. They're not perfect. There are mistakes that are

made from time to time.  But in the vast majority of cases, attorneys, my colleagues, such as Mr. Isihara, are doing a very good job, and they're working very, very hard.

And all of us are very concerned about situations just like this, and this is the worst-case scenario that occurred in this case.  And the more people we have who can contribute to this effort, to bulk up our team and to maintain the morale and the people that we have who are doing the best that they can, the better for the compliance and for, you know, bringing about the kind of thing that we wish had happened in this case.

So I just would urge the Court to hold back from any kind of contempt or sanctions to the extent that you feel that you're able within your discretion.

THE COURT:  Thank you, Mr. Fuller.

Mr. Isihara, did you want to say anything as to that issue?

MR. ISIHARA:  Your Honor, I -- I just want to reiterate what Mr. Fuller said, that I am sincerely apologetic about my role in this situation.  Again, as I mentioned before, I've had anywhere from 126 to 129, and the paralegals have said that might be a lowball estimate of the number of cases that we've handled over the last month.

I just want to note to the Court that I've been in front of you, Your Honor, just twice, so it's a very small

Appellate Case: 26-1327     Page: 68     Date Filed: 03/11/2026 Entry ID: 5617236

fraction of these cases that are resulting in significant failings on our part. And I do acknowledge my role in this situation as it evolved and transpired, but just to contextualize again, this has been a period of immense sort of personnel shifts and transitions in our office.

I -- personally, I haven't really practiced in federal court before. This is a new experience for me. We've come in in the midst of a crisis. And I will say that my other SAUSA coworkers and I, who were sent here on a Army mission, essentially, we've tried to make the best of our situation, adapt to these new circumstances; but this is uncharted waters for us. And I really would appreciate the Court taking into consideration the fact that we, in the vast majority of cases, have complied with court orders, have done our due diligence, and have been responsively communicative, and this is simply a very low error rate.

And this is a serious error in this case. There's a human being on the other side. We're immensely sympathetic about that, and we -- you know, I feel enormous guilt in this situation about my role in how this transpired. But I would ask Your Honor to take into consideration the fact that our overall error rate, looking into the overall aggregate picture, is -- is low.

THE COURT: Thank you for that.

We will take a break. We'll come back on at 3:45.

At that point in time, I will expect to be informed of where the A-File is located, the deportation officer assigned to the case, and the OPLA attorney assigned to the case. All right.

(Recess taken at 3:26 p.m.)

* * * * *

(3:45 p.m.)

**IN OPEN COURT**

THE COURT: All right. We are back on the record at 3:45.

Either Mr. Fuller or Mr. Isihara, I'll give you the opportunity to tell me who that OPLA contact was.

MR. ISIHARA: Yes, Your Honor. I have that information available right now. The individual's name, if you're ready, is Cassondra Bly. First name is spelled C-A-S-S-O-N-D-R-A; last name is spelled B-L-Y. And she was the OPLA point of contact we were assigned.

THE COURT: Okay. Great. Thank you for that.

DFOD Ladwig, I think the other two pieces of information I needed were from you.

Who was the assigned deportation officer in El Paso?

MR. LADWIG: Yes, ma'am, I have that, but I -- it's my understanding that this officer was the case

Appellate Case: 26-1327    Page: 70    Date Filed: 03/11/2026 Entry ID: 5617236

officer -- I may be mistaken -- but it was DO Monica Hernandez.

THE COURT: Great.

And you said it's your understanding. How did you come to know that or believe that it's Monica Hernandez?

MR. LADWIG: Based on comments that she made in the case. The case has been -- since the alien has been released, it's actually been transferred up here to St. Paul on a nondetained docket. So, like I said, I can't say for sure. She may have just been covering for someone else. But she was the last one that had input into the -- our systems of record about the case prior to the release --

THE COURT: Okay.

MR. LADWIG: -- so that's why I think that.

THE COURT: Great.

MR. LADWIG: And then your second question --

THE COURT: And then the location of the A-File.

MR. LADWIG: It is in El Paso, and it's in a hearing drawer. So, ironically, there's a assistant field office director from El Paso that is up here in St. -- Minneapolis, anyway. I have him reaching out to his field office to try to track down both the property and the identity documents as we speak.

THE COURT: Great. Thank you for doing all that.

I assume if it's in El Paso and you know the

precise location, those documents could be returned by tomorrow. Is that a fair assumption?

MR. LADWIG: I assume that it could be, but in the rare -- if not tomorrow, the next day type of thing, but yes.

The property might be a little bit different because it's a possibility that it could have been sent back up here. But we're going to run that down. And as soon as feasible, we will be able to get that back to Ms. Lins.

THE COURT: Okay. Based on everything I've heard today, and recognizing that I have given the Government a chance here, I have little confidence that petitioner's property will be returned to him absent some sanction.

Therefore, I'm going to hold the Government in civil contempt of court, and I am going to impose civil contempt sanctions on Matthew Isihara as it appears that he, based on the evidence before the Court at this hearing, is primarily responsible for the ongoing noncompliance with the Court's February 9th order.

This civil contempt sanction is deemed coercive, meaning it is imposed to force the Government to comply with the Court's order.

Civil contempt is appropriate when a party has notice of a clear and specific underlying order and violates that order. Here the Court's February 9th order was clear

Appellate Case: 26-1327     Page: 72     Date Filed: 03/11/2026 Entry ID: 5617236

and specific: all property, including identification documents, must be returned to petitioner.

Mr. Isihara admitted today that he had notice of the February 9th order given that he was assigned to the case as early as February 2nd. He received the February 9th order by e-mail, and he was notified of the Court's order once again by petitioner's counsel on February 12th through her e-mail. He also admits that he has done nothing on this case until this morning.

Finally, there's indisputably a continuing violation of the order as petitioner has not been returned all of his property, notwithstanding the Government's and Mr. Isihara's failure to ensure compliance with my order.

The Government's only argument against a finding of contempt is the assertion that the Government's failure to comply was not intentional or willful, but, rather, because of understaffing and high caseloads. But willfulness is not a requirement to impose coercive civil contempt sanctions. More to the point, the Government's understaffing and high caseload is a problem of its own making and absolutely does not justify flagrant disobedience of court orders.

Having found that civil contempt is appropriate, the burden shifts to the Government to show that it is unable to comply. The Government has not met that burden.

Appellate Case: 26-1327    Page: 73    Date Filed: 03/11/2026 Entry ID: 5617236

In crafting a contempt sanction, the Court must consider three factors:

First, the character and magnitude of the harm.

Second, the probable effectiveness of any suggested sanction in bringing about the desired result.

And, third, the amount of the Government and, specifically, the Special Assistant U.S. Attorney Ishihara's financial resources and the consequent seriousness of the burden to that particular party.

In weighing those factors, the Court determines that imposing on Mr. Isihara a $500 fine for each day that petitioner does not have his ID documents in hand is appropriate and constitutes the least restrictive sanction to ensure compliance with the Court's order. That fine will begin accruing tomorrow so that if petitioner's documents are returned to him tomorrow, no fine will be imposed.

The Government must file a Certificate of Compliance on the docket when petitioner, through his counsel, has received his identification documents.

So that is what I will require. I don't believe I need to do additional hand-holding on this. I think it's clear what needs to happen. Petitioner needs to get his documents immediately, and there will be a $500 sanction any day beyond tomorrow that they are not received by his attorney.

Appellate Case: 26-1327    Page: 74    Date Filed: 03/11/2026 Entry ID: 5617236

Mr. Fuller?

MR. FULLER:  I don't think I have any questions or further comments.  Thank you, Your Honor.

THE COURT:  Okay.  All right.

The Court has every level of confidence that this can get complied with, but because I haven't been given a level of confidence at today's hearing, that is why some sanction had to be imposed.

So I hope to receive a Certificate of Compliance tomorrow because that means my order will have been complied with and petitioner will be made whole by the return of those documents.

All right.  We are adjourned.

(Court adjourned at 3:52 p.m.)

*       *       *

I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by: *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR