No. 26-1327

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

RIGOBERTO SOTO JIMENEZ,

Petitioner-Appellee,

v.

MATTHEW ISIHARA,

Appellant,

TODD BLANCHE, Acting Attorney General; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; TODD M. LYONS, Acting Director of Immigration and Customs Enforcement; DAVID EASTERWOOD, Acting Director, St. Paul Field Office Immigration and Customs Enforcement; WARDEN, ERO El Paso Camp East Montana, El Paso, Texas,

Respondents.

On Appeal from the United States District Court for the District of Minnesota

## BRIEF FOR APPELLANT SPECIAL ASSISTANT UNITED STATES ATTORNEY MATTHEW ISIHARA

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL N. ROSEN
*United States Attorney*

MARK R. FREEMAN
DANIEL TENNY
JAYNIE LILLEY
*Attorneys, Appellate Staff*
*Civil Division, Room 7321*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*(202) 514-3542*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal from an order of civil contempt against a Special Assistant United States Attorney. Oral argument would aid the Court in resolving these questions, and we respectfully request that the Court hold oral argument allotting 15 minutes per side.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION ..................................................................6

STATEMENT OF THE ISSUE.........................................................................6

STATEMENT OF THE CASE.........................................................................7

SUMMARY OF ARGUMENT........................................................................ 13

STANDARD OF REVIEW ............................................................................. 17

ARGUMENT ............................................................................................... 17

THE DISTRICT COURT ERRED IN HOLDING MR. ISIHARA
     IN CIVIL CONTEMPT............................................................................ 17

    A.    The district court lacks authority to hold litigation counsel in civil
        contempt based on a party's conduct. .........................................................17

        1.    Coercive contempt is designed to compel conduct by the
               party at which the underlying order is directed. .............................17

        2.    The district court improperly imposed contempt on Mr.
               Isihara for the conduct of ICE. ........................................................21

        3.    Mr. Isihara did not violate the return-of-property
               requirement. ........................................................................................27

    B.    The district court failed to give Mr. Isihara adequate notice. ...................31

    C.    This Court should vacate the contempt and provide needed
        guidance in this area. ....................................................................................33

CONCLUSION ................................................................................................................. 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Acosta v. La Piedad Corp.,*
    894 F.3d 947 (8th Cir. 2018) ...................................................................................17

*Avila v. Bondi,*
    No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026) ....................................2, 8, 21

*Chaganti & Assocs., P.C. v. Nowotny,*
    470 F.3d 1215 (8th Cir. 2006) ...................................................................................18

*Cheney v. U.S. Dist. Ct. for D.C.,*
    542 U.S. 367 (2004).....................................................................................................35

*Dellinger, In re,*
    461 F.2d 389 (7th Cir. 1972) ......................................................................................24

*FTC v. Neiswonger,*
    580 F.3d 769 (8th Cir. 2009) ..............................................................................7, 17, 31

*FTC v. Stroiman,*
    428 F.2d 808 (8th Cir. 1970) ......................................................................................20

*Gompers v. Bucks Stove & Range Co.,*
    221 U.S. 418 (1911)................................................................................................14, 18

*Grand Jury Procs., Horak, In re,*
    625 F.2d 767 (8th Cir. 1980) ......................................................................................20

*Grand Jury Subpoenas, In re,*
    123 F.3d 695 (1st Cir. 1997) .......................................................................................25

*Independent Fed'n of Flight Attendants v. Cooper,*
    134 F.3d 917 (8th Cir 1998) .......................................................................................20

*International Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.,*
    293 F.3d 409 (8th Cir. 2002) ......................................................................................27

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n,*
    389 U.S. 64 (1967)....................................................................................................17-18

*International Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) ................................................................7, 18, 25

*J.G.G. v. Trump*,
147 F.4th 1044 (D.C. Cir. 2025) ...........................................................35

*Jake's, Ltd., Inc. v. City of Coates*,
356 F.3d 896 (8th Cir. 2004) .................................................................30

*Maggio v. Zeitz*,
333 U.S. 56 (1948)..........................................................................7, 18-19

*Markus, In re*,
78 F.4th 554 (2d Cir. 2023).................................................................20

*Murphy, In re*,
560 F.2d 326 (8th Cir. 1977) .............................................................20

*Nevitt, In re*,
117 F. 448 (8th Cir. 1902) ...................................................................18

*Oriel v. Russell*,
278 U.S. 358 (1929).............................................................................19

*Penfield Co. v. SEC*,
330 U.S. 585 (1947).............................................................................20

*Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*,
419 F.3d 794 (8th Cir. 2005) ...........................................................32-33

*Rutledge, In re*,
956 F.3d 1018 (8th Cir. 2020) ...........................................................35

*Sanford L. Firm, In re*,
106 F.4th 706 (8th Cir. 2024) .............................................................32

*Schlafly v. Eagle F.*,
970 F.3d 924 (8th Cir. 2020) ...........................................................31-32

*Shillitani v. United States*,
384 U.S. 364 (1966)..............................................................................20

*Sisney v. Kaemingk,*
   15 F.4th 1181 (8th Cir. 2021) ..................................................................19, 30, 31

*Taggart v. Lorenzen,*
   587 U.S. 554 (2019) ..............................................................................................30

*Turner v. Rogers,*
   564 U.S. 431 (2011) ..............................................................................................19

*United States v. Bryan,*
   339 U.S. 323 (1950) ..............................................................................................19

*United States v. Edgar,*
   82 F.3d 499 (1st Cir. 1996) ..................................................................................26

*United States v. Munsingwear, Inc.,*
   340 U.S. 36 (1950) .................................................................................................33

*United States v. Santee Sioux Tribe of Neb.,*
   254 F.3d 728 (8th Cir. 2001) ........................................................................7, 18-19

*United States v. United Mine Workers of Am.,*
   330 U.S. 258 (1947) ......................................................................................7, 18, 19

*United States v. Watson Chapel Sch. Dist. No. 24,*
   446 F.2d 933 (8th Cir. 1971) ...............................................................................19

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC,*
   27 F.4th 622 (8th Cir. 2022) ...............................................................................27

**Statutes:**

8 U.S.C. § 1225(b)(2) ...................................................................................................7

28 U.S.C. § 516 ...........................................................................................................24

28 U.S.C. § 519 ...........................................................................................................24
28 U.S.C. § 1291 ...........................................................................................................6

28 U.S.C. § 1651 .........................................................................................................35

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .................................................................. 6

Fed. R. App. P. 43(c)(2) ...................................................................... 1

Model Rules of Pro. Conduct (A.B.A. 2025):
  r. 1.7(a)(2) .......................................................................................26
    cmt. 10 ...........................................................................................26
  r. 3.7...............................................................................................26
    cmt 1 ..............................................................................................26

**Other Authorities:**

Memorandum Opinion and Order, *J.B.C.O. v. Bondi*,
  Nos. 26-cv-424, 26-cv-639, 26-cv-778, 26-cv-832, 26-cv-1429
  (D. Minn. Mar. 6, 2026), R. Doc. 32 .................................................. 5, 34

Minute Entry, *Juan Carlos G. A. v. Bondi*, No. 26-cv-941
  (D. Minn. Feb. 9, 2026), R. Doc. 15 .................................................13

Order, *Indriany S.M.C. v. Easterwood*, No. 26-cv-539
  (D. Minn. Feb. 26, 2026), R. Doc. 16 .............................................. 5, 34

Order, *Izea v. Bondi*, Nos. 26-cv-1499, 26-CV-1548
  (D. Minn. Mar. 9, 2026), R. Doc. No. 21 ......................................... 5, 34

Restatement (Third) of Agency (2006):
  § 1.01 cmt. c....................................................................................24
  § 1.01 cmt. f(1)............................................................................23-24
  § 7.01 cmt. c....................................................................................24
  § 7.01 cmt. d....................................................................................24

*The Attorney General's Role as Chief Litigator for the United States*,
  6 Op. O.L.C. 47 (1982) .................................................................22

# INTRODUCTION[1]

The district court imposed personal-capacity contempt sanctions on Special Assistant United States Attorney Matthew Isihara in an attempt to coerce the agency he represented into complying with an order directing the agency to return property to a habeas petitioner. That contempt order was manifestly improper. A lawyer does not, by representing a client in district court, assume personal liability for the client's compliance with court orders. The district court's misuse of its civil contempt powers will have concrete and entirely unjustified consequences for Mr. Isihara's professional future. This Court should vacate the contempt order and make clear that a district court cannot properly impose personal costs on a government lawyer as a means to influence the conduct of a federal agency.

Mr. Isihara was caught in the crossfire in a difficult situation. As has been well documented, the Department of Homeland Security significantly expanded Immigration and Customs Enforcement (ICE) operations in Minnesota, resulting in a large number of immigration detentions. Many detainees filed habeas petitions in federal district court arguing that the government's refusal to release them on bond was unlawful. In scores of cases, judges in the District of Minnesota agreed with that argument and ordered the immediate release of detainees. In a precedential decision, this Court has since rejected the argument on which many of those rulings rested, *see*

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Todd Blanche is automatically substituted for his predecessor.

*Avila v. Bondi*, No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026), thus making clear that the many release orders that relied on such a theory were improper.

The wave of habeas grants had enormous practical consequences. The district court and the U.S. Attorney's Office for the District of Minnesota were overwhelmed with habeas petitions and scheduling orders with tight deadlines. The government brought in more resources to attempt to handle the deluge—including Mr. Isihara, an Army lawyer who was temporarily assigned to the District of Minnesota as a Special Assistant United States Attorney. The incumbent employees of the U.S. Attorney's Office, many of them career professionals with years of experience, worked tirelessly to address the flood of litigation and to coordinate with ICE to ensure its awareness of and compliance with release orders. In the course of this extraordinary surge in litigation, even those best efforts were not always sufficient. The government missed some court deadlines, and despite ICE's good-faith efforts to comply with all the orders issued by the district courts, in some circumstances ICE was unable to do so.

In this case, the district court (erroneously, as it turned out) ordered the habeas petitioner released in Minnesota along with his property. ICE released the petitioner in Texas, not in Minnesota, and did not immediately provide him with his property.

Although Mr. Isihara had been assigned to the case, due to the smothering burden of other habeas litigation he was unable to give it adequate attention, a circumstance he regrets and for which he apologized on the record to the district court. But the location of petitioner's release and the disposition of his property by

2

ICE were not attributable to any action or inaction by Mr. Isihara. The only plausibly relevant responsibility Mr. Isihara had was to ensure that ICE was aware of the habeas release order, but petitioner's counsel had promptly provided a copy of that order to ICE. Nothing that happened thereafter, including the delay in petitioner's receipt of his possessions, was attributable to any action or inaction by Mr. Isihara.

The district court nonetheless held Mr. Isihara personally in civil contempt and ordered that he pay running fines of $500 per day from his personal pocket until ICE came into compliance by returning petitioner's possessions. ICE complied with the district court's order before Mr. Isihara was actually required to pay any monetary penalty, but the district court's subsequent order purporting to purge the contempt doubled down on its criticism of Mr. Isihara and its insistence that he had flouted the court's authority. The court announced that determination despite the absence of any connection between Mr. Isihara's conduct and the disposition of petitioner's possessions; despite Mr. Isihara's evident good-faith effort to carry out his responsibilities as an officer of the court; and despite Mr. Isihara's sincere contrition, expressed on the record to the district court.

That personal-capacity contempt order was patently improper. An attorney representing a client is of course accountable for his own compliance with court orders and for discharging his duties as an officer of the court. But his client's actions are not his own. The district court had no authority to hold Mr. Isihara in contempt for the actions of ICE. In doing so, the court failed to adhere to well-recognized

3

limits on its civil contempt power, which in turn reflect basic considerations of due process.

The district court's error strikes at the heart of the adversarial process. Punishing the lawyer for the alleged transgressions of the client is unjust, corrupts the attorney-client relationship by driving a wedge between the lawyer's personal interests and the client's best interests, and raises profound questions of legal ethics. In the context of government litigation, such an order also intrudes on the statutory role of the Department of Justice, including the United States Attorney, and disregards lines of statutory authority and public accountability established by Congress. A Special United States Attorney in the District of Minnesota does not control ICE, and it is wholly inconsistent with the structure of our government—not to mention the personal due-process interests of individual public servants like Mr. Isihara—for a federal court to penalize Department of Justice trial counsel for actions taken by an agency of the Department of Homeland Security. Such an order ironically undermines the intragovermental coordination necessary to promote and ensure compliance with the orders of federal courts. And it chills vigorous advocacy by Department of Justice lawyers who now, in the District of Minnesota, must fear for their personal interests when assigned to represent an agency accused of noncompliance with court orders.

Moreover, this was not an isolated incident. Multiple district-court judges in the District of Minnesota have threatened civil—and sometimes even criminal—

4

contempt sanctions against attorneys from the U.S. Attorney's Office based not on alleged personal wrongdoing by those attorneys, but on allegations that ICE has not complied with aspects of habeas-release orders in cases in which those attorneys appeared as litigation counsel. *See, e.g.*, Order, *Izea v. Bondi*, Nos. 26-cv-1499, 26-cv-1548 (D. Minn. Mar. 9, 2026), R. Doc. 21 (order to show cause why, *inter alia*, the U.S. Attorney and the Civil Chief of the U.S. Attorney's Office should not be held in civil or criminal contempt based on ICE's alleged noncompliance with court orders); Memorandum Opinion and Order, *J.B.C.O. v. Bondi*, Nos. 26-cv-424, 26-cv-639, 26-cv-778, 26-cv-832, 26-cv-1429 (D. Minn. Mar. 6, 2026) R. Doc. 32 (setting hearing to address whether to impose civil contempt and impose fines and requiring the appearance of the U.S. Attorney and Civil Chief); Order, *Indriany S.M.C. v. Easterwood*, No. 26-cv-539 (D. Minn. Feb. 26, 2026) R. Doc. 16 (indicating that United States Attorney would need "to show cause why [he] should not be held in contempt for failure to comply with court orders" in future cases). Judges have threatened these personal consequences even though no one seriously thinks the attorneys of the U.S. Attorney's Office control ICE or can personally guarantee ICE's compliance with court orders; and even though virtually all agree the U.S. Attorney's Office has tried in good faith to manage the herculean challenges posed by the recent tsunami of (as it turns out, generally meritless) immigration habeas petitions. The hard-working professionals of the U.S. Attorney's Office deserve better.

The district court's contempt order should be vacated, and this Court should provide clear guidance that district courts may not impose personal consequences on government attorneys to influence the conduct of federal agencies. To the extent that this Court has any concerns about its authority to issue such guidance on Mr. Isihara's behalf, it may treat this appeal as a mandamus petition on behalf of the United States, which plainly has standing to obtain an order prohibiting the district court from treating its attorneys in this fashion.

## STATEMENT OF JURISDICTION

The district court entered a final judgment in the underlying habeas corpus proceeding on February 9, 2026. App.17, R. Doc. 6. The district court held Special Assistant United States Attorney Matthew Isihara in civil contempt on February 20, 2026. *See* Add.9, Hearing Tr., at 72. Mr. Isihara filed a notice of appeal on February 23, 2026, within the 60-day period provided for by Federal Rule of Appellate Procedure 4(a)(1)(B). R. Doc. 25. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court has already entered final judgment in the underlying case. As discussed in the government's opposition to petitioner's motion to dismiss, this appeal is not moot.

## STATEMENT OF THE ISSUE

Whether the district court erred by holding a government attorney personally in civil contempt for his client's failure to comply with a court order.

The authorities most apposite to this question are the following:

6

- *Cases*: *Maggio v. Zeitz,* 333 U.S. 56 (1948); *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994); *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728 (8th Cir. 2001); *FTC v. Neiswonger*, 580 F.3d 769 (8th Cir. 2009).

## STATEMENT OF THE CASE

This appeal arises from a habeas action in which petitioner challenged his detention under the immigration laws and obtained a judgment ordering the government to release petitioner from custody and specifying that the release had to satisfy certain conditions. The government did release petitioner from custody but failed immediately to satisfy the conditions, and the district court imposed a civil contempt order based on that failure. The contempt order was issued not only against the agency responsible for releasing petitioner and complying with those conditions—ICE—but also against Special Assistant United States Attorney Matthew Isihara in his personal capacity. This appeal challenges that contempt order as to Mr. Isihara.

1. On February 2, 2026, petitioner filed a petition for a writ of habeas corpus, arguing that he was improperly detained pursuant to 8 U.S.C. § 1225(b)(2) without a hearing. *See* R. Doc. 1. The district court entered judgment in his favor one week later, on February 9, on the ground that the government had not opposed the petition and adopting petitioner's statutory argument. Add.2, App.20, R. Doc. 5, at 2. The district court ordered the government to release petitioner within four days, by February 13, "in Minnesota" and "without imposing any conditions of release," and

7

also ordered the government "to return all property to him." App.17, R. Doc. 6. The court further ordered the government "to file a status report certifying its compliance with this Order by no later than 3:00 p.m. on Tuesday, February 17, 2026." *Id.* This Court has since held that habeas orders of this kind are erroneous because petitioners in these circumstances are considered applicants for admission subject to mandatory detention, without a bond hearing. *See Avila v. Bondi*, No. 25-3248, 2026 WL 819258, at *6 (8th Cir. Mar. 25, 2026) ("[T]he district court erred in holding that the Government could not detain [petitioner] without bond under § 1225(b)(2)(A) and in granting habeas relief on that basis.").

Petitioner's counsel transmitted the order to the ICE facility in El Paso, Texas, where petitioner was then detained, and further notified ICE that the order required petitioner's release in Minnesota with all of his property. *See* Hearing Tr., at 7. ICE released petitioner from custody the following day, on February 12, in Texas, without his identification documents. Add.14, App.9, R. Doc. 23, at 2. The day petitioner was released in Texas, petitioner's counsel noted for ICE the requirement to release petitioner in Minnesota with his property. The same day, petitioner's counsel contacted the U.S. Attorney's Office about the location of petitioners' release. Hearing Tr., at 9-11; Hearing Tr., at 10-13.

Special Assistant United States Attorney Matthew Isihara, who was on detail from the Judge Advocate General's Corps of the United States Army to the U.S. Attorney's Office for the District of Minnesota, had been assigned to the case

8

(although an appearance had not been entered on his behalf). *See* Hearing Tr., at. 34, 38. Accordingly, petitioner's counsel's inquiry was routed to Mr. Isihara, and Mr. Isihara responded to petitioner's counsel that he would investigate and respond later that day. Hearing Tr., at 11-13. Mr. Isihara did not substantively respond, an omission that he subsequently explained to the court was a regrettable consequence of the overwhelming volume of immigration habeas petitions that Mr. Isihara and others in the U.S. Attorney's Office were then handling. Hearing Tr., at 12-13, 27-29.

On February 16, petitioner's counsel sought an update from Mr. Isihara, and she also notified Mr. Isihara that petitioner had been released without his identification documents and asked for assistance in the return of his documents. Hearing Tr., at 10-11. After the expiration of the deadline for the government's status report on February 17, petitioner filed a letter with the district court noting the government's partial non-compliance with the February 9 order. *See* R. Doc. 8. Later that day, the district court issued a show-cause order directed at the "Government":

> [The] Government must show cause, if any there be, why it should not be held in contempt for (1) failing to release Petitioner in Minnesota, as required by the Court's February 9 Order, (2) failing to return Petitioner's property to him, as required by the Court's February 9 Order, and (3) failing to timely provide a status update to the Court, as required by the Court's February 9 Order.

App.15, R. Doc. 9, at 1. The district court further set a hearing for the following day and directed that certain "individuals" appear in court, including the Chief of the Civil Division of the U.S. Attorney's Office or "an Assistant U.S. Attorney responsible for the management of this case" and "[a] representative (or representatives) of

9

Immigration and Customs Enforcement who had notice of the Court's February 9 Order and is responsible for Petitioner's custody, property, and release." App.16, R. Doc. 9, at 2. The court's order did not suggest that the court was considering imposing personal-capacity sanctions on government counsel.

2. At the show-cause hearing the following day, Mr. Isihara and the Civil Chief appeared along with a representative of ICE. They apologized for the errors, explaining that the caseload volume in the U.S. Attorney's Office and at ICE had been "overwhelm[ing]" but that the government's non-compliance had been inadvertent and not willful. Hearing Tr., at 34; Hearing Tr., at 43-44 (Mr. Isihara's apology to the court for the oversight in this case). Mr. Isihara explained that his personal tracking system had been overwhelmed by the large volume of cases— roughly 130 cases assigned to him in a single month. Hearing Tr., at 43 ("I've tried to be as accountable as possible, but this has been--this has been an enormous challenge and a steep learning curve."). Mr. Isihara also outlined the systemic steps that the U.S. Attorney's Office had taken, including increasing staffing and procedural improvements, to allow for better communications between the U.S. Attorney's Office and ICE. Hearing Tr., at 43-44.

The district court determined that there were "two outstanding noncompliance issues": the return of petitioner's property and the filing of the government's status update. Hearing Tr., at 30, 32, 40. The court conducted an extensive inquiry into what it deemed a "complete breakdown" between the U.S. Attorney's Office and

ICE, and directed that ICE disclose the names of ICE officials who were involved in petitioner's release in Texas and in the failure to release petitioner's identification documents. Hearing Tr., at 32-36, 52-63. The district court examined an ICE official for information about the status and location of petitioner's property. Hearing Tr., at 55-58. The district court also queried whether "ICE compl[ied] with" the order to release petitioner in Minnesota. Hearing Tr., at 57.

As to Mr. Isihara, the court stated that he had failed to promptly transmit the order to ICE (although, as noted, petitioner's counsel had done so); had failed to respond substantively to opposing counsel's February 12 email; had failed to take steps on February 16 to seek the return of petitioner's property; and had failed to timely file a status report confirming ICE's compliance with the district court's order. *See* Hearing Tr., at 29, 40; Add. 15-16, App.8-9, R. Doc. 23, at 3-4.

3. The district court held the "Government in civil contempt of court," but specifically "impose[d] civil contempt sanctions on Matthew Isihara" based on the court's belief that he was "primarily responsible for the ongoing noncompliance" with the court's order. Add.9-10, Hearing Tr., at 72-73; *see also* Add.16, App.9, R. Doc. 23, at 4 ("SAUSA Isihara was most at fault for the Government's continued noncompliance with the Court's February 9 order."); Add.16, App.9 n.1, R. Doc. 23, at 4 n.1 ("It is unclear whether others were also responsible for this noncompliance . . . the Court has no understanding as to who released [petitioner] in Texas, rather than Minnesota, and without his property."). After concluding that civil

contempt was appropriate, the court stated that the "burden shifts to the Government to show that it is unable to comply" and reasoned that the government had not met its burden, rejecting the government's argument that the errors were inadvertent and a result of resource constraints. Add.10, Hearing Tr., at 73.

The district court stated that any contempt sanction must account for the character and magnitude of the harm; the probable effectiveness of a particular sanction; and the "amount of the Government, and, specifically, the Special Assistant U.S. Attorney Isihara's financial resources and the consequent seriousness of the burden to that particular party." Add.11, Hearing Tr., at 74. The court then imposed a personal-capacity fine on Mr. Isihara of $500 for each day that petitioner did not have his property, beginning on February 20 (that is, two days after the hearing). Add.11, Hearing Tr., at 74.

ICE located and returned petitioner's property on February 19—*i.e.*, the day after the district court's hearing and order, and before the first $500 daily fine against Mr. Isihara accrued. The district court then issued an order concluding that ICE's return of petitioner's property had purged Mr. Isihara's contempt. *See* Add.13, App.6, R. Doc. 23. That order explained that the civil contempt order had been justified, in part, based on what the court regarded as the government's misconduct in other cases

not handled by Mr. Isihara as well as the court's own warning to Mr. Isihara in another case,[2] Add.17-21, App.12-16, R. Doc. 23, at 5-9.

4.  Mr. Isihara promptly filed a notice of appeal to challenge the personal-capacity contempt order.  R. Doc. 25.  Petitioner filed a motion to dismiss for lack of subject-matter jurisdiction but took no position on the merits of the contempt order.  Mot. to Dismiss 1 (Mar. 11, 2026).  Mr. Isihara opposed the motion, explaining that he suffered significant collateral consequences from the contempt order, which was unlawfully imposed on him based on ICE's conduct, and that the controversy was therefore not moot.  *See* Opp'n to Mot. to Dismiss 14-15 (Mar. 23, 2026).  The motion remains pending in this Court.  (The government does not challenge the contempt order to the extent that it was directed to the government generally or to the Department of Homeland Security and ICE, as those aspects of the order are likely moot.)

## SUMMARY OF ARGUMENT

The contempt order issued against Mr. Isihara in his personal capacity as a sanction for ICE's partial non-compliance with a habeas release order was an abuse of discretion and should be vacated.

---

[2] In that case, Mr. Isihara had substituted for prior government counsel on Friday, February 6, the same day in which the court issued an order to show cause and set a hearing for Monday, February 9.  At the hearing, the court faulted Mr. Isihara for, *inter alia*, lack of knowledge of the location of the petitioner's property in that case.  *See* Minute Entry, *Juan Carlos G. A. v. Bondi*, No. 26-cv-941 (D. Minn. Feb. 9, 2026), R. Doc. 15.

A. The district court lacked authority to hold an attorney in civil contempt for the out-of-court conduct of a federal agency that he was representing in court. Coercive civil contempt is not a license for a federal court to sanction or punish any party or attorney before the court. It is a tool a court may use to compel a party to comply with a court order directed *at that party*. An order of civil contempt leaves the contemnor with "the keys of his prison in his own pocket," such that by complying with the court's directive, the contemnor absolves himself of the contempt and lifts the coercive sanction. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911) (quotation marks omitted). Accordingly, coercive contempt is manifestly inappropriate where the asserted contemnor cannot himself comply and release himself from the contempt.

That is the case here. This is a habeas case, and the writ issued by the district court ran against petitioner's jailer—ICE. The requirement in the habeas order to return petitioner's property upon his release likewise belonged to ICE, not Mr. Isihara. Only ICE, and not Mr. Isihara, had the power to comply with the order. Yet the district court held Mr. Isihara in personal contempt; calculated a coercive daily fine based "specifically" on "Special Assistant U.S. Attorney Isihara's financial resources," Add.11, Hearing Tr., at 74; and ordered Mr. Isihara to pay that running fine until ICE complied with the requirements of the habeas order. The fact that the court held the contempt order against Mr. Isihara purged based on ICE's delivery of petitioner's documents only underscores that Mr. Isihara and his legal career were

14

wrongfully held captive to induce ICE's compliance. That was error, and this Court should vacate the contempt order on that basis.

Relatedly, the district court lacked any basis for finding that Mr. Isihara violated the court's directive to return petitioner's property. The district court had no basis to determine that Mr. Isihara was aware of and violated a "clear and specific order" that required Mr. Isihara himself to perform a specific out-of-court action—a requirement for contempt. The district court stated that Mr. Isihara had "primary responsibility" for ICE's non-compliance but provided no explanation for that conclusion, and none exists. The only responsibility that Mr. Isihara could plausibly have had that would relate to ICE's compliance would be to inform ICE of the release order, but the record is clear that ICE received prompt notice of the order.

B. The district court also failed to comply with procedural prerequisites for contempt, which provides an independent ground for vacating the contempt order. In particular, contempt cannot be issued without first providing notice and an opportunity to be heard. Here, Mr. Isihara testified at the show-cause hearing, but the court gave no hint until after that testimony was complete that it regarded Mr. Isihara as personally responsible for the conduct of ICE and that it was considering imposing personal sanctions on that basis.

C. This Court should provide clear guidance to district courts in this Circuit regarding the inappropriateness of punishing attorneys personally for the conduct of their clients. Several district-court judges in the District of Minnesota—following the

15

lead of the district court here—have likewise threatened to hold government attorneys, including the U.S. Attorney himself, in personal contempt based on ICE's conduct in immigration habeas matters. Such threats are manifestly inappropriate. District courts of course must possess the power to enforce their orders. But they cannot do so by punishing attorneys for the conduct of their clients. Such orders not only exceed a court's lawful contempt powers but also corrupt the attorney-client relationship and raise fundamental questions of legal ethics. In the context of government litigation, such orders also disregard lines of statutory authority and public accountability established by Congress and undermine the Department of Justice's role in counseling agencies about compliance issues. And they chill vigorous advocacy by government lawyers who must now fear for their personal interests when assigned to represent an agency accused of noncompliance with court orders.

Petitioner has taken no position on the propriety of the contempt order in this case but has sought to dismiss this appeal on mootness grounds. Petitioner's arguments are wrong for the reasons given in the Mr. Isihara's opposition, but if the Court perceives any barrier to providing necessary guidance on Mr. Isihara's behalf, it should construe this appeal as a petition for a writ of mandamus by the United States, which plainly has standing to obtain an order directing a district court to vacate unlawful sanctions imposed on government counsel.

## STANDARD OF REVIEW

This Court reviews the imposition of a civil contempt order for abuse of discretion. *See FTC v. Neiswonger*, 580 F.3d 769, 773 (8th Cir. 2009). Because the "contempt power is a most potent weapon," this Court reviews the grant of a contempt "searchingly." *Acosta v. La Piedad Corp.*, 894 F.3d 947, 950-51 (8th Cir. 2018) (quotation marks omitted). And the Court reviews de novo whether the district court applied the wrong legal standard. *Id.* at 951.

## ARGUMENT

## THE DISTRICT COURT ERRED IN HOLDING MR. ISIHARA IN CIVIL CONTEMPT.

The district court erroneously held Mr. Isihara in contempt in his personal capacity, not to compel his own compliance with any order of the court or to regulate any conduct in the courtroom, but as a guarantor of ICE's out-of-court compliance. The court's calculated attempt to impose personal costs on government counsel to induce a federal agency to act crossed any conceivable line about the appropriate use of the contempt power. This Court should vacate the order.

### A. The district court lacks authority to hold litigation counsel in civil contempt based on a party's conduct.

#### 1. Coercive contempt is designed to compel conduct by the party at which the underlying order is directed.

The "judicial contempt power is a potent weapon," and when civil contempt is imposed inappropriately, "it can be a deadly one." *International Longshoremen's Ass'n,*

17

*Loc. 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76 (1967). As such, the contempt power "uniquely is liable to abuse." *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (quotation marks omitted); *id.* ("Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.").

A district court can impose civil contempt sanctions "to compensate parties aggrieved by contumacious conduct or to coerce compliance with the court's orders," but not to punish. *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1224 (8th Cir. 2006); *see also United States v. United Mine Workers of Am.,* 330 U.S. 258, 303 (1947). The district court purported to justify its order in this case as a form of coercive civil contempt, which is designed to compel a reluctant party to comply with a court order. *Maggio v. Zeitz,* 333 U.S. 56, 69 (1948). An order of coercive civil contempt is one that permits the contemnor to comply with the court's directive and purge the contempt, such that the contemnor "carries the keys of his prison in his own pocket." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911) (quoting *In re Nevitt*, 117 F. 448, 461 (8th Cir. 1902)). Accordingly, an order of civil contempt is appropriate "only when it appears that obedience is within the power of the party being coerced by the order." *Maggio,* 333 U.S. at 69; *Bagwell*, 512 U.S. at 828; *see also United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 737 (8th Cir. 2001) (reversing contempt sanctions against a

former official who "is no longer able to purge himself of the contempt").  The

inability to comply with an order is a "complete defense" to contempt. *United States v.*

*Bryan*, 339 U.S. 323, 330-31 (1950) ("A court will not imprison a witness for failure to

produce documents which he does not have unless he is responsible for their

unavailability. . . ." (citations omitted)).

Under these principles, civil contempt cannot lie unless the persons or parties

subject to the contempt sanction are themselves the persons or parties capable of

complying with the court order.  In the canonical case, coercive civil contempt is

imposed on a party to litigation to compel compliance with a court order directed at

the party.  *See, e.g.*, *Turner v. Rogers*, 564 U.S. 431, 444 (2011) (coercive civil contempt

on parent for failure to pay child support obligations); *United Mine Workers*, 330 U.S. at

298 (contempt on union for failure to comply with temporary restraining order

prohibiting strike); *Oriel v. Russell*, 278 U.S. 358, 363 (1929) (failure to comply with

order to "turn over to the receiver in bankruptcy the property of the bankrupt");

*Sisney v. Kaemingk*, 15 F.4th 1181, 1201 (8th Cir. 2021) (discussing the possibility of

coercive contempt against state prison system to comply with injunction affirmed on

appeal); *United States v. Watson Chapel Sch. Dist. No. 24*, 446 F.2d 933, 938 (8th Cir.

1971) (contempt imposed on school board for failure to comply with desegregation

order).

In rare circumstances, courts have issued compensatory contempt orders

directed at non-parties when "the nonparty aids or abets a named party in a concerted

violation of a court order." *Independent Fed'n of Flight Attendants v. Cooper*, 134 F.3d 917, 920 (8th Cir 1998). Courts can also impose coercive civil contempt on other persons when court orders constrain their conduct. For example, contempt orders can be directed at witnesses to compel their testimony or to enforce subpoenas. *See, e.g.,* *Shillitani v. United States*, 384 U.S. 364, 365 (1966) (coercive contempt to compel grand jury testimony); *Penfield Co. v. SEC*, 330 U.S. 585, 595 (1947) (coercive civil contempt to enforce a subpoena duces tecum issued by SEC); *FTC v. Stroiman*, 428 F.2d 808, 809 (8th Cir. 1970) (enforcement of FTC subpoena); *In re Grand Jury Procs., Horak*, 625 F.2d 767, 770 (8th Cir. 1980) (contempt to compel the testimony of a witness refusing to testify before a federal grand jury after having been granted immunity). Contempt can also be directed at attorneys who have failed to comply with an order directed at the attorney or to carry out a duty imposed on the attorney as an officer of the court. *In re Murphy*, 560 F.2d 326, 332 (8th Cir. 1977) (failure to produce documents); *see also* *In re Markus*, 78 F.4th 554, 565 (2d Cir. 2023) (attorney held in civil contempt for bad-faith noncompliance with court order directing the attorney to instruct client's associates to comply with subpoena).

It is entirely improper, however, to hold a person in contempt for someone else's misconduct. That limitation is inherent in the nature of coercive civil contempt, which is designed to compel compliance with court orders by imposing sanctions if the contemnor persists in refusing to abide by the court's directive. The premise, as noted above, is that the party subject to the contempt sanction has the power to purge

the contempt by complying with the underlying order.  It is fitting to characterize as "contempt" a person's refusal to comply with a court order despite having the power to do so.  But an individual without such power cannot, legally or linguistically, be described as acting in contempt of the court's order.

### 2. The district court improperly imposed contempt on Mr. Isihara for the conduct of ICE.

The order at issue here cannot be reconciled with these principles.  The underlying habeas order directed the government to release petitioner "in Minnesota" and "without imposing any conditions of release and to return all property to him." App.17, R. Doc. 6.  That order, like any habeas order, was directed at the government officials responsible for petitioner's detention, all of whom were named as respondents in their official capacities.  DHS, and not its litigation counsel, had petitioner in custody, had possession of petitioner's property, and thus had the power to comply with the court's order.[3]

The district court nonetheless issued a contempt order directed at Matthew Isihara, the Special Assistant United States Attorney who was assigned to litigate this

---

[3] The government does not here address the merits of the underlying habeas order and others like it, which in addition to being premised on an erroneous construction of the immigration laws, *see Avila v. Bondi*, No. 25-3248, 2026 WL 819258 (8th Cir. Mar. 25, 2026), raised complicated issues relating to a court's authority, under the habeas statute, to impose conditions on the location and circumstances of release, and on whether the petitioner properly established habeas venue based on the location of the petitioner's detention at the time petition was filed.  For present purposes, the relevant point is that the underlying order, whether correct or incorrect, was directed at ICE.

case. In particular, Mr. Isihara was personally held in contempt and subjected to a fine of $500 per day until ICE returned petitioner's property—a fine that the court selected "specifically" based on "Special Assistant U.S. Attorney Isihara's financial resources," Add.11, Hearing Tr., at 74. The court thus imposed a running contempt fine on Mr. Isihara individually, calculated based on his personal ability to pay, until *his client* complied with a court order directed to *that client*.[4]

That order was patently inappropriate. As discussed above, coercive contempt orders are properly directed at the party with the obligation, and the power, to comply with the court's order. Mr. Isihara had no such obligation or power. He could not comply with the order himself, nor could he compel ICE to act. He was merely a hostage to ensure ICE's compliance.

That the legal obligation to comply fell on ICE and not on Mr. Isihara is evident on the face of the habeas order, including from the fact that the order did not name Mr. Isihara as a respondent or require or forbid any conduct by him. If there were any doubt, however, the district court's own factual inquiry confirmed that the specific objective of the order—the return of petitioner's property—was ICE's responsibility. The district court's examination of an ICE official at the February 18

---

[4] While Department of Justice attorneys represent individual agencies in litigation such that agencies can be referred to as "clients," the Department is obligated to represent the interests of the United States. *See The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 53-59, 62 (1982) (describing the Attorney General's "obliga[tion] to represent the broader interests" of the Executive Branch as well as "'client' agencies").

22

hearing made clear that the return-of-property problem involved an ICE-internal process. *See* Hearing Tr., at 30-33; *see also* Hearing Tr., at 49-62 (describing ICE process for locating and returning petitioner's property). The district court thus had undisputed factual evidence before it that ICE, not Mr. Isihara, was responsible for delivering petitioner's possessions as the order required. The court's determination that Mr. Isihara nevertheless had "primary responsibility" for the untimely delivery of those possessions, Add.9, Hearing Tr., at 72; Add.16-17, App.9-10, R. Doc. 23 at 4-5, was clearly erroneous.

The district court's order also reflects a fundamental misunderstanding of the relative roles of an attorney and a client. As any public defender will attest, attorneys do not control and are not personally responsible for their clients' actions. The principal-agent relationship runs in the other direction: the client exercises control over the attorney, and may be held responsible for the attorney's actions within the authorized scope of the representation. *See* Restatement (Third) of Agency § 1.01 cmt. f(1) (2006) ("An essential element of agency is the principal's right to control the agent's actions."); *id.* cmt. c ("The person represented has a right to control the actions of the agent."). By contrast, because the agent does not control the actions of the principal, an agent's own liability "is based on the agent's own conduct and not conduct of the principal or other agents." *Id.* § 7.01 cmt. c. Put another way, "there is no principle of 'respondeat inferior.'" *See id.* cmt. d ("An agent is not subject to

23

liability for torts committed by the agent's principal that do not implicate the agent's own conduct. . . .").[5]

Although we are unaware of many previous cases in which courts have attempted to hold attorneys in contempt based on the misbehavior of their clients, the Seventh Circuit has addressed the issue and recognized the distinction between an attorney's obligations and the obligations of a client. In particular, in reviewing a criminal contempt order imposed on both a party and his attorney for disruptive conduct in the courtroom, the court recognized the difference between an attorney's "fail[ing] to aid the court in maintaining order," on the one hand, and an attorney's "actively encourag[ing] their clients in their disruptions" on the other. *In re Dellinger*, 461 F.2d 389, 399 (7th Cir. 1972). The court properly held that "[a]n attorney has no affirmative obligation to restrain his client under pain of the contempt sanction." *Id.* Only when an attorney affirmatively "encourages disruptive behavior by a client or fans the flames of existing frictions" might the attorney personally be liable for contempt. *Id.* at 399-400.

---

[5] In the case of the federal government, the client agency's ability to control the attorney is more limited due to authority vested in the Attorney General to determine the litigating positions of the United States, 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."); *see also id.* § 519 (supervision of litigation vested in Attorney General), but the point relevant here remains the same. Department of Justice attorneys generally have no authority to direct the primary conduct of federal agencies.

Moreover, as the Seventh Circuit also recognized, interposing the possibility of contempt in the attorney-client relationship drives a chilling wedge between attorney and client. "[C]ompelling an attorney to control the conduct of his client under threat of the contempt sanction," the Seventh Circuit explained, "might well destroy the confidence in the attorney-client relationship which is necessary to a proper and adequate defense." *Dellinger*, 461 F.2d at 399. And that case at least involved actions in the courtroom, in the presence of the court. Outside of the courtroom, the attorney has even less ability to coerce his client's conduct, especially where compliance with complex injunctions involves extensive coordination of different officials within an agency. *Cf. Bagwell,* 512 U.S. at 832, 833-34 (acknowledging complexity in holding party in contempt for "out-of-court disobedience to complex injunctions"). The idea that an attorney could be held personally responsible for the actions of a client outside of the courtroom—here, in a law-enforcement context—is all the more extraordinary.

A contempt order against an attorney predicated on a client's conduct also inappropriately pits the personal interests of the attorney against the best interests of the client. It is well settled in a host of contexts that "[a] lawyer should not be required to choose between the interests of his or her client and his or her own interests." *In re Grand Jury Subpoenas*, 123 F.3d 695, 699 (1st Cir. 1997) (reviewing motion to quash subpoena of law firm's records about its client). Any rule that

25

"promotes conflicts of interest hinders the fair representation of the client and makes it less likely that clients will be well served by their attorneys." *Id.*

The rules of legal ethics likewise take enormous care to ensure that an attorney's personal interests are not injected into the representation of a client. Attorneys are generally prohibited from representing a client if "there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer." Model Rules of Pro. Conduct r. 1.7(a)(2) (A.B.A. 2025). "For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." *Id.* cmt. 10. For similar reasons, attorneys are generally prohibited from acting as advocates if they are also likely to serve as witnesses, Model Rule 3.7, in part because "[c]ombining the roles of advocate and witness . . . can involve a conflict of interest between the lawyer and the client." *Id.* cmt 1; *see also United States v. Edgar*, 82 F.3d 499, 507 (1st Cir. 1996) ("As a witness, the attorney/witness has separate legal and practical interests apart from those of his client[,] . . . [which] may or may not coincide with those of the attorney/witness and his client.").

In light of these rules, it would plainly be improper for opposing counsel to threaten an attorney's personal interests in order to induce the attorney's client to engage in particular behavior. The contempt order at issue here gives rise to similar concerns. The district court erred in holding Mr. Isihara's personal interests at risk in order to induce ICE to comply with the court's orders.

26

### 3. Mr. Isihara did not violate the return-of-property requirement.

Relatedly, the contempt order here is erroneous because it did not arise from Mr. Isihara's personal failure to abide by a court order. Civil contempt can be premised only on "clear and convincing evidence" that the alleged contemnor was aware of and violated a "clear and specific . . . order" that required him to perform specific actions. *See Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, 27 F.4th 622, 624 (8th Cir. 2022); *International Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002).

The district court's contempt order is premised on the finding that Mr. Isihara had violated the court's prior order insofar as it required the return of property to petitioner. But, as noted, Mr. Isihara had no role in any ongoing violation. The district court faulted Mr. Isihara for failing to timely transmit the district court's order to ICE, *see* Hearing Tr., at 26-28, but there is no dispute that by the time of the contempt hearing, ICE had received the release order. *See* App.92, R. Doc. 10. In fact, prior to the hearing, Mr. Isihara had personally contacted ICE regarding the need to return petitioner's property. Hearing Tr., at 30-35. At the time the court entered the contempt order, therefore, there was plainly no action that Mr. Isihara was required to take pursuant to the court's order.

The district court stated that Mr. Isihara was "primarily responsible" for ICE's non-compliance but provided no explanation of why that was the case. Add.9,

Hearing Tr., at 72; *see also* Add.16-17, App.9-10, R. Doc. 23 at 4-5. The court cited various alleged failures of Mr. Isihara, but none of them has any causal relationship to ICE's failure to return petitioner's property at the moment of petitioner's release. The only conduct of Mr. Isihara's with any colorable causal relationship to that violation was Mr. Isihara's failure to follow up substantively in response to inquiries from petitioner's counsel. Hearing Tr., at 26-29; Add.15-16, App.8-9, R. Doc. 23, at 3-4. As noted, Mr. Isihara had already followed up by the time of the hearing, *see* Hearing Tr., at 30-31; Add.16, App.9, R. Doc. 23, at 4. But more fundamentally, nothing in the underlying court order, which was directed at ICE, imposed any specific and enforceable obligation on Mr. Isihara to respond to inquiries from opposing counsel.

The Department of Justice of course takes seriously the importance of complying with court orders, and Department attorneys, very much including Mr. Isihara and his colleagues at the U.S. Attorney's Office for the District of Minnesota, expend great effort to communicate with federal agencies and opposing counsel about the importance of complying with court orders and to assist agencies in construing orders to ensure compliance (even where, as this Court recently held with regard to habeas orders like the one at issue here, the orders were issued in error). The Department deeply regrets that, as a consequence of the overwhelming volume of immigration habeas petitions, this process did not function properly in this and other cases. But the idea that government attorneys are compelled, upon penalty of contempt, to satisfy a district court regarding the level and timeliness of their

engagement with client agencies or opposing counsel is extraordinary, and this Court should flatly reject any such proposition. There is a world of difference between the failure of good-faith efforts to obtain a desired result and contempt of court.

The other actions or inactions that ostensibly gave rise to the contempt finding are even further afield. Much of the conduct for which the district court faulted Mr. Isihara was in the past and had no relation to compliance with the order of which Mr. Isihara was supposedly held in civil contempt. *See* Add.13-14, App.8-9, R. Doc. 23, at 1-2 (government's failure to respond to habeas petition); Add.14, App.9, R. Doc. 23, at 2 (petitioner was released in Texas instead of Minnesota, resulting in petitioner's overnight stay in a shelter upon release); Add.14, App.9, R. Doc. 23, at 2 (asserted failure of government not to arrange transportation to Minnesota from Texas).

To make matters worse, the district court announced that it had based its holding in part on its perception of the conduct of U.S. Attorney's Office and Mr. Isihara in other habeas cases. Even apart from the factual inaccuracy of the district court's statements impugning the hard-working personnel of the U.S. Attorney's Office, who made herculean efforts to deal with the flood of immigration cases and habeas orders, holding a government attorney in personal contempt is not an appropriate method for a court to express its dissatisfaction with the performance of the U.S. Attorney's Office or to correct what the court regarded as systemic issues within the government. *See* App.12-13, R. Doc. No. 23 at 5-6 (describing the

"understaffing and oversized caseloads" at the U.S. Attorney's Office); *id.* (citing government's alleged "oversights and disobedience" in nine other cases).

This Court has reversed the imposition of a purportedly coercive contempt sanction where it was improperly imposed "for completed, as opposed to future, conduct." *Jake's, Ltd., Inc. v. City of Coates*, 356 F.3d 896, 903 (8th Cir. 2004). Even in the face of frustration that "prior orders had been repeatedly disobeyed," the court's effort to punish the lack of compliance was not a lawful exercise of civil contempt authority. *See id.* That principle is controlling here. Indeed, by the time of the show-cause hearing and contempt order, there was nothing left for Mr. Isihara to do to comply with the court's order. Any of Mr. Isihara's conduct the district court found to be problematic had already been remedied or rendered moot and thus coercive contempt could not have induced his compliance.

This factual disconnect between Mr. Isihara's alleged failings and the order being enforced would warrant reversal under any standard, but the court's error is made all the more clear by the "no fair ground of doubt" standard that applies to contempt orders. *See Sisney v. Kaemingk*, 15 F.4th 1181, 1201 (8th Cir. 2021) (contempt is appropriate when there is "no fair ground of doubt as to the wrongfulness of [the alleged contemnor's] conduct" with respect to an order (quotation marks omitted)). Because contempt is a potent weapon, courts impose contempt only where there is "no objectively reasonable basis for concluding that [the alleged contemnor's] conduct might be lawful" under the order. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019); *cf.*

30

*Sisney*, 15 F.4th at 1201 (compensatory contempt improper although "defendants may not have achieved full compliance as swiftly as they might have, and certainly not as swiftly as [plaintiff] would have liked, but " we cannot say that there is no 'fair ground of doubt as to the wrongfulness of [their] conduct'" (second alteration in the original)).  Here, none of Mr. Isihara's conduct even arguably violated the district court's order to return petitioner's property, much less violated the order beyond any fair ground of doubt.

**B.      The district court failed to give Mr. Isihara adequate notice.**

The considerations discussed above provide ample basis to vacate the district court's order, and this appeal should properly be resolved on those grounds.  In addition to removing the unwarranted stain of the contempt order from Mr. Isihara's record and disposing of the matter before the Court, such a resolution would serve the valuable function of providing clear guidance to district courts that government counsel may not be held personally responsible for the conduct of federal agencies.

The district court also erred for an unrelated reason:  before holding an individual in contempt, a court must give notice and opportunity to be heard.  *See FTC v. Neiswonger*, 580 F.3d 769, 774 (8th Cir. 2009) (quotation marks omitted).  That basic requirement was not satisfied here.

Coercive civil contempt sanctions can only be imposed "in an ordinary civil proceeding upon notice and an opportunity to be heard." *Neiswonger*, 580 F.3d at 774 (emphasis omitted); *Schlafly v. Eagle F.*, 970 F.3d 924, 937 (8th Cir. 2020) ("[B]efore a

district court may impose sanctions, the individual must receive notice that sanctions against h[im] are being considered and an opportunity to be heard." (alterations in original; quotation marks omitted)).  Here, the district court gave no notice to Mr. Isihara that he might face personal-capacity contempt.  The order to show cause directed the "[g]overnment" to explain why it should not be held in contempt but gave no indication the court was considering holding any individual—let alone the government's trial counsel—personally in contempt.  *See* App.98-99, R. Doc. No. 9, at 1-2.  Mr. Isihara was not specifically named in the order or otherwise given notice prior to the hearing that he might face personal-capacity contempt—indeed, he had not even entered an appearance in the case.  *Id.*; Hearing Tr., at 20.  Mr. Isihara thought he was attending a hearing related to ICE's compliance with the court order, and was prepared to address, as counsel, legal and factual issues on that topic.  He had no basis to believe that he could personally be subject to sanction, that he might need to retain counsel for himself, or that the court might hold him personally responsible for ICE's alleged deficiencies—a result, as noted above, that is flatly contrary to the rules governing civil contempt and appears to be without precedent in this Circuit, and which Mr. Isihara therefore had no plausible reason to anticipate.

This Court has recognized that an attorney "was entitled to notice that the district court was considering these harsh sanctions against him *personally*."  *In re Sanford L. Firm*, 106 F.4th 706, 719 (8th Cir. 2024); *Plaintiffs' Baycol Steering Comm. v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005) ("[B]efore a district court may impose

sanctions, the individual must receive notice that sanctions against her are being considered and an opportunity to be heard."). The district court's procedural failings here provide yet another reason that the contempt finding against Mr. Isihara must be vacated.

**C. This Court should vacate the contempt and provide needed guidance in this area.**

Petitioner has not taken a position on the propriety of the contempt order in this case but has filed a motion to dismiss this appeal on mootness grounds. Petitioner's arguments are mistaken for the reasons given in our opposition. *See* Opp'n to Mot. to Dismiss 9-18 (Mar. 23, 2026). At an absolute minimum, if this Court agrees with petitioner that this case has become moot, it should enter an order formally vacating the district court's orders to ensure that they do not have any ongoing consequences for Mr. Isihara. *Cf. United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Even apart from the need to resolve the very real controversy that Mr. Isihara's case presents, this Court's guidance is urgently needed. Following the district court's lead in this case, multiple district-court judges in the District of Minnesota have subsequently threatened civil—and sometimes even criminal—contempt sanctions of their own against attorneys from the U.S. Attorney's Office. As discussed above, those individual attorneys cannot plausibly be described as having themselves violated habeas release orders. Rather, the threatened contempt sanctions against Department

of Justice attorneys have arisen from dissatisfaction with ICE's compliance with habeas orders in cases in which those attorneys appeared as government litigation counsel.  *See, e.g.*, Order, *Izea v. Bondi*, Nos. 26-cv-1499, 26-cv-1548 (D. Minn. Mar. 9, 2026), R. Doc. 21 (order to show cause why, *inter alia*, the U.S. Attorney and the Civil Chief of the U.S. Attorney's Office should not be held in civil or criminal contempt based on ICE's alleged noncompliance with court orders); Memorandum Opinion and Order, *J.B.C.O. v. Bondi*, Nos. 26-cv-424, 26-cv-639, 26-cv-778, 26-cv-832, 26-cv-1429 (D. Minn. Mar. 6, 2026) R. Doc. 32 (setting hearing to address whether to impose civil contempt and impose fines, and requiring the personal attendance of the U.S. Attorney and Civil Chief); *Indriany S.M.C. v. Easterwood*, No. 26-539 (D. Minn. Feb. 26, 2026) R. Doc. 16 (indicating that the personal appearance of the United States Attorney "to show cause why [he] should not be held in contempt for failure to comply with court orders" would be required in case of future noncompliance).  This Court's guidance is necessary.

As noted, the government has explained why Mr. Isihara's appeal presents a live controversy for this Court's resolution.  But if the Court concludes that Mr. Isihara's personal appeal is moot, this Court should construe this appeal, which was authorized by the Solicitor General of the United States, as a mandamus petition by the United States.  The United States plainly has standing to seek an order from this Court directing the district court to vacate its contempt finding and cease threatening personal consequences for government attorneys who are attempting to perform their

34

crucial functions in difficult circumstances. And the injury to the United States from such an order is equally plain.

This Court may issue a writ of mandamus to vindicate a "clear and indisputable" right, if the writ is "appropriate under the circumstances" and if "no other adequate means" of relief exists. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004); *In re Rutledge*, 956 F.3d 1018, 1025 (8th Cir. 2020); *see also* 28 U.S.C. § 1651. Each of those requirements is satisfied in this instance. As discussed above, the district court's contempt order exceeds any possible bounds of a court's contempt authority and interposes a wedge between government counsel and the client agency, chilling the attorney-client relationship and undermining lines of statutory authority and public accountability established by Congress. The district court imposed coercive civil contempt on a Department of Justice lawyer despite the fact that Mr. Isihara did not violate the order at issue and was not the party responsible for compliance. And the government has no other adequate means of relief where courts impose, or threaten to impose, personal contempt on government counsel to compel a federal agency to act. *Cf. J.G.G. v. Trump*, 147 F.4th 1044, 1059 (D.C. Cir. 2025) ("The imposition or threat of contempt against Executive Branch officials can further support mandamus.") (collecting cases); *Rutledge*, 956 F.3d at 1027. If Mr. Isihara cannot obtain relief by appeal, mandamus is warranted.

## CONCLUSION

For the foregoing reasons, the district court's order should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL N. ROSEN
  *United States Attorney*

MARK R. FREEMAN
DANIEL TENNY

  *s/ Jaynie Lilley*
JAYNIE LILLEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7321*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3542*
  *jaynie.lilley2@usdoj.gov*

April 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,286 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Jaynie Lilley*

JAYNIE LILLEY

# CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jaynie Lilley*
JAYNIE LILLEY