No. 26-1327

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

RIGOBERTO SOTO JIMENEZ,

Petitioner-Appellee,

v.

MATTHEW ISIHARA,

Appellant,

TODD BLANCHE, Acting Attorney General; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; DAVID J. VENTURELLA, Acting Director of Immigration and Customs Enforcement; DAVID EASTERWOOD, Acting Director, St. Paul Field Office Immigration and Customs Enforcement; WARDEN, ERO El Paso Camp East Montana, El Paso, Texas,

Respondents.

On Appeal from the United States District Court
for the District of Minnesota

**REPLY BRIEF**

BRETT A. SHUMATE
  *Assistant Attorney General*

DANIEL N. ROSEN
  *United States Attorney*

MARK R. FREEMAN
DANIEL TENNY
JAYNIE LILLEY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7321*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3542*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION ...........................................................................................1

ARGUMENT ...................................................................................................4

THE DISTRICT COURT ERRED IN HOLDING MR. ISIHARA
      PERSONALLY IN CIVIL CONTEMPT .............................................................4

    A.     Mr. Isihara did not hold the "keys of his prison in his own
           pocket." ............................................................................................4

    B.     The district court erroneously found Mr. Isihara personally
           responsible for violating the court's habeas order. ...................................10

    C.     The district court failed to give Mr. Isihara notice that he faced
           personal contempt. ...........................................................................16

    D.     Mr. Isihara did not forfeit his challenge to the contempt order. ...............19

    E.     Amicus's jurisdictional arguments lack merit. ...........................................21

CONCLUSION .............................................................................................. 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 26-1327    Page: 2    Date Filed: 06/23/2026 Entry ID: 5653588

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Carter, In re,*
691 F.2d 390 (8th Cir. 1982) ................................................................ 9-10

*Carter v. City of Memphis,*
636 F.2d 159 (6th Cir. 1980) ................................................................... 10

*Coleman v. Espy,*
986 F.2d 1184 (8th Cir. 1993) ................................................................. 10

*Dellinger, In re,*
461 F.2d 389 (7th Cir. 1972) ...................................................................... 7

*FTC v. Neiswonger,*
580 F.3d 769 (8th Cir. 2009) ................................................................... 16

*Grand Jury Proceedings, In re,*
875 F.2d 927 (1st Cir. 1989) .................................................................... 20

*International Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.,*
293 F.3d 409 (8th Cir. 2002) ............................................................... 10-11

*Jake's, Ltd., Inc. v. City of Coates,*
356 F.3d 896 (8th Cir. 2004) ................................................................. 9, 11

*McGregory, In re,*
223 F. App'x 530 (8th Cir. 2007) ............................................................ 23

*Panera, LLC v. Dobson,*
999 F.3d 1154 (8th Cir. 2021) ................................................................. 24

*Precision Specialty Metals, Inc. v. United States,*
315 F.3d 1346 (Fed. Cir. 2003) ............................................................... 21

*Sanford L. Firm, In re,*
106 F.4th 706 (8th Cir. 2024) ............................................................ 17, 18

*Shea v. Donohoe Constr. Co.,*
795 F.2d 1071 (D.C. Cir. 1986) ............................................................... 10

*Sisney v. Kaemingk,*
15 F.4th 1181 (8th Cir. 2021) ................................................................. 13

Appellate Case: 26-1327    Page: 3    Date Filed: 06/23/2026 Entry ID: 5653588

*Sullivan v. Committee on Admissions & Grievances*,
  395 F.2d 954 (D.C. Cir. 1967) ...................................................................... 21-22

*U.S. S.E.C. v. Hyatt*,
  621 F.3d 687 (7th Cir. 2010) .................................................................... 18, 20

*United States v. Bryan*,
  339 U.S. 323 (1950) ...................................................................................... 11

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950) ........................................................................................ 24

*United States v. Watson Chapel Sch. Dist. No. 24*,
  446 F.2d 933 (8th Cir. 1971) ...................................................................... 22

*Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*,
  27 F.4th 622 (8th Cir. 2022) ...................................................................... 10

*Weitz Co. v. Lloyd's of London*,
  574 F.3d 885 (8th Cir. 2009) ...................................................................... 21

*Williams, In re*,
  156 F.3d 86 (1st Cir. 1998) .................................................................... 22, 24

**Rules:**

Federal Rule of Appellate Procedure 21 ............................................................ 23

**Other Authorities:**

Restatement (Third) of Agency, § 7.01 cmt. d (2006) ...................................... 8

Appellate Case: 26-1327   Page: 4   Date Filed: 06/23/2026 Entry ID: 5653588

# INTRODUCTION

The brief of the court-appointed amicus only confirms that the district court abused its discretion when it held Special Assistant United States Attorney Matthew Isihara in personal contempt in an effort to coerce Mr. Isihara's client, a government agency, to comply with a habeas order.

Amicus agrees that this case involves (or purports to involve) "coercive civil contempt," which "is appropriate where the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of his prison in his own pocket." Amicus Br. 17 (quotation marks omitted). But as amicus does not dispute, the order that Mr. Isihara was held in coercive civil contempt for violating was a habeas release order directed *to the government*, not to Mr. Isihara personally. The obligation in that order to return petitioner's belongings likewise belonged *to the government* and specifically to ICE, not Mr. Isihara. Yet the district court held Mr. Isihara in personal contempt and ordered him to pay a running fine until ICE complied with that order. That was a wholly improper use of coercive civil contempt: Mr. Isihara had no ability himself to "commit[] an affirmative act" to purge the contempt. The "keys of his prison" were in *ICE's* pocket. Indeed, as amicus does not dispute, the district court ultimately held the contempt purged when ICE delivered petitioner's property—underscoring that it was ICE, not Mr. Isihara, whose conduct the district court sought to coerce all along.

Amicus argues that the court was nonetheless justified in holding Mr. Isihara in contempt because, although petitioner's counsel immediately notified ICE of the habeas order, Mr. Isihara was also obliged to "relay" the court's order "to ICE through proper channels." Amicus Br. 20. But that theory cannot support the district court's coercive contempt order either. The compliance that the district court sought to coerce was the actual return of petitioner's belongings, not Mr. Isihara's communication with his client. That is why the district court held the contempt purged when, and only when, ICE delivered the missing possessions to petitioner. And in any event, amicus acknowledges that Mr. Isihara did personally relay the court's order to ICE through proper channels "after receiving notice of the show-cause hearing," Amicus Br. 21—and thus before the court entered its contempt order.

That should be the end of the case. Mr. Isihara did not have the "keys of his prison in his own pocket," because by the time of the contempt order he had already done the only thing that could conceivably have been expected of him. The district court nonetheless held Mr. Isihara in personal contempt, unfairly holding his career and reputation hostage in order to coerce ICE to act more quickly.

The district court's error goes to the heart of our adversarial system of justice. The district court inserted itself into the attorney-client relationship and drove a wedge between Department of Justice attorneys and the agencies they represent in court. The district court also wrongly stained the reputation of a hard-working career federal attorney who was placed in a difficult situation. Such an order casts a long

2

shadow, in Minnesota and beyond. This Court should redress Mr. Isihara's injury, and provide guidance to district courts, by vacating the contempt order and clarifying that imposing personal liability on governmental litigation counsel is not a proper means of seeking to induce particular conduct by federal agencies.

Amicus's suggestion that Mr. Isihara forfeited the arguments advanced in this appeal is meritless. As we have explained, the district court provided no advance notice that Mr. Isihara might be held in contempt personally—a defect that provides an independent basis for vacating the court's order, not a reason to affirm it on the ground that Mr. Isihara's uncounseled, on-the-spot oral reaction to the court's inquiries did not flesh out the legal arguments advanced in his brief on appeal.

Amicus is likewise mistaken to contest this Court's jurisdiction over Mr. Isihara's appeal. None of the cases on which amicus relies addresses the unique injuries to counsel recognized in the cases identified in our opposition to the motion to dismiss. Nor does amicus identify any case in which a court of appeals held that it lacked jurisdiction over an appeal by a party wrongly held in civil contempt for the actions of another. And in any event, the Court may treat this appeal as a mandamus petition on behalf of the United States to obtain an order prohibiting the district court from holding a government attorney in personal contempt. As noted above, the district court's error is clear and indisputable—indeed, the relevant facts and law are undisputed—and the serious harms to the United States and to the relationship between attorneys and counsel amply warrant this Court's intervention.

3

Appellate Case: 26-1327    Page: 7    Date Filed: 06/23/2026 Entry ID: 5653588

**ARGUMENT**

## THE DISTRICT COURT ERRED IN HOLDING MR. ISIHARA PERSONALLY IN CIVIL CONTEMPT.

As our opening brief explained, the district court lacked authority to hold Mr. Isihara personally in civil contempt in order to influence the out-of-court conduct of the federal agency that he represented. That order crossed any conceivable line about the appropriate use of a court's coercive contempt power, and amicus fails to rehabilitate it.

### A. Mr. Isihara did not hold the "keys of his prison in his own pocket."

It is black-letter law that coercive civil contempt orders must be directed at the party with the obligation and the ability to comply with the order at issue. But Mr. Isihara had no personal obligation or ability to return petitioner's belongings, which (as amicus concedes, Amicus Br. 24) were in the possession and control of ICE. He could not comply with the court's order personally, nor could he compel ICE to act. He was just a hostage to ensure ICE's compliance. Amicus cites no authority that would plausibly justify that misuse of the court's contempt power.

Amicus nonetheless defends the order at issue here as an exercise of the district court's authority to "impose civil contempt sanctions . . . to coerce compliance with the court's orders." Amicus Br. 17. As amicus acknowledges, such orders "compel performance of a required act," and are "appropriate where the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of

4

his prison in his own pocket." *Id.* (quotation marks omitted). The order at issue here could thus be defensible only if there was some court-ordered action that Mr. Isihara personally was required to take, but had not yet taken, at the time the district court entered its contempt order.

Amicus identifies no such action. Amicus urges that Mr. Isihara knew of the district court's order on the merits of the habeas case but "failed to relay it to ICE through proper channels." Amicus Br. 20. But the district court's order cannot be sustained on that basis. As an initial matter, it is abundantly clear that what the district court intended to coerce was ICE's return of petitioner's possessions, not any action by Mr. Isihara. That is evident from the terms of the district court's contempt order itself, Add.9-10, Hearing Tr., at 72-73, and from the fact that the district court held the contempt purged only after ICE found and returned petitioner's belongings, Add.16, App.9, R. Doc. 23, at 4.

Even on its own terms, moreover, amicus's contention that Mr. Isihara "failed to relay" the court's habeas order to ICE "through proper channels," Amicus Br. 20, does not establish a basis for a coercive civil contempt order. Department attorneys of course should relay relevant court orders to affected agencies immediately, and Mr. Isihara expressed his profound regret on the record for neglecting to do so here. Hearing Tr., at 43-44. But coercive civil contempt is about coercing compliance with court orders. No court order enjoined Mr. Isihara personally to perform any specific act in connection with this case. There was therefore nothing for the district court to

5

compel Mr. Isihara personally to do (or cease doing) through a coercive contempt order.

In all events, amicus acknowledges (Amicus Br. 21) that Mr. Isihara *did* transmit the court's order to the proper component of ICE, even though ICE had previously received notice of the same order from petitioner's counsel. Amicus emphasizes that Mr. Isihara did so "[o]nly after receiving notice of the show-cause hearing." *Id.* (quotation marks omitted). But as amicus also acknowledges—and as the record makes clear—Mr. Isihara provided that notice to ICE *before* the hearing at which he was held in contempt. *Id.* In other words, by the time the district court entered its coercive contempt order, Mr. Isihara had already done what amicus contends Mr. Isihara was obliged to do. There was no plausible compliance left to coerce.

In fact, the district court was well aware that Mr. Isihara had nothing further to do in this case. It was undisputed at the show-cause hearing both that ICE had received timely notice of the court's order from petitioner's counsel and that it was ICE's responsibility to locate petitioner's possessions. A witness from ICE testified at the hearing that he had spoken to someone else at ICE who was "reaching out to his field office to try to track down both the property and the identity documents as we speak." Add.8, Hearing Tr., at 71. The district court responded that the court had "little confidence that petitioner's property will be returned to him absent some sanction," and that "[t]herefore" the court was "going to hold the Government in civil contempt of court," and "going to impose civil contempt sanctions on Matthew

6

Isihara." Add.9, Hearing Tr., at 72. The court did not suggest that Mr. Isihara had some additional, overdue task to perform. Instead, Mr. Isihara was held in contempt—with running daily fines calculated "specifically" on his personal "financial resources," Add.11, Hearing Tr., at 74—as a guarantor of his client's compliance with a court order.

Amicus at points seems almost to embrace that result. Amicus suggests (at 23) that while "ICE carried the 'keys' to purge the contempt," Mr. Isihara "had the power to unlock the cell by telling ICE how to open it." In this sense, amicus reasons, "[t]he process played out as everyone hopes it would in all attorney-client representation," because a court can "assume lawyers have at least *some* ability to influence their client's compliance with court orders." Amicus Br. 23. This Court should reject in the strongest terms that attorney-as-hostage theory of a district court's civil contempt powers. Attorneys do of course wield some practical influence over their clients' conduct. But it does not follow that a federal court may impose personal-liability contempt fines on an attorney in order to induce the attorney's client to comply with a court order. If a party claims that compliance with a court order is impossible, a district court cannot put that theory to the test by threatening personal sanctions on the attorney unless the party complies. Nor could a court impose running personal-capacity contempt fines on a witness's lawyer until the witness agreed to testify. The very concept is anathema to our legal system. *See In re Dellinger*, 461 F.2d 389, 399 (7th Cir. 1972).

7

Appellate Case: 26-1327    Page: 11    Date Filed: 06/23/2026 Entry ID: 5653588

As the opening brief explained, attorneys do not control and are not personally responsible for their clients' actions.  Interposing the threat of contempt in the attorney-client relationship drives a chilling wedge between attorney and client, inappropriately pitting the personal interests of the attorney against the best interests of the client.  And in the context of government litigation, as explained, such an order also intrudes on the statutory role of the Department of Justice, including the United States Attorney, disregarding lines of statutory authority and public accountability established by Congress.  *See* Opening Br. 21-26.

Amicus does not meaningfully engage with any of this.  Nor does amicus cite any case, from any jurisdiction, upholding a coercive civil contempt issued against an attorney on an analogous theory.  Indeed, even amicus ultimately backs away from the attorney-as-hostage theory in a footnote.  *See* Amicus Br. 23 n.4 ("To be clear: if a lawyer shares an order with a client and the client still refuses to return property anyway, the lawyer should not be personally liable.").  This Court should reject the attorney-as-hostage theory, both as applied by the district court and as defended by amicus, and make clear that "there is no principle of 'respondeat inferior'" in civil contempt law.  Restatement (Third) of Agency § 7.01 cmt. d (2006).

For the most part, rather than defend the actual order entered by the district court, amicus engages in an extended recitation of factual issues that had been resolved or rendered moot by the time of the contempt hearing.  Amicus Br. 20-24.  Those issues have no bearing on the validity of the district court's coercive contempt

8

Appellate Case: 26-1327     Page: 12     Date Filed: 06/23/2026 Entry ID: 5653588

order, because a coercive contempt order is prospective in effect—it must be intended to coerce compliance in the future. As this Court has explained, coercive civil contempt does not permit a federal court to sanction or punish a party or attorney for past conduct; rather it is a tool for enforcing prospective compliance with a court's orders. *See Jake's, Ltd., Inc. v. City of Coates*, 356 F.3d 896, 903 (8th Cir. 2004) (reversing a coercive contempt sanction imposed "for completed, as opposed to future, conduct"). Amicus's litany of alleged deficiencies by Mr. Isihara at earlier stages of the case thus provides no justification for the court's contempt order.

Equally irrelevant is the undisputed point that attorneys may be sanctioned and held in contempt based on their own actions. Amicus Br. 17-20. The key point is that an attorney must held accountable only for his own acts and omissions. Amicus cites no case holding or suggesting that an attorney can be held in contempt based on the acts or omissions of his client, as happened here.

Amicus relies on cases (at 19) involving *compensatory* civil contempt, which does not require an unfulfilled obligation but instead compensation for a past wrong. Thus, it may be appropriate to compel a private attorney, rather than his client, to pay compensation where the client was not responsible for non-compliance with a court order. *See, e.g., In re Carter*, 691 F.2d 390, 391-92 (8th Cir. 1982) (per curiam) (upholding a compensatory contempt sanction against an attorney who received notice of restraining order but "disregard[ed]" it, knowingly allowing his client to

9

proceed with an eviction of a debtor in violation of the order).[1]  And a court may

conclude that an attorney's failure to prosecute a case should create consequences for

the attorney rather than his "blameless" client.  *See Shea v. Donohoe Constr. Co.*, 795 F.2d

1071, 1077 (D.C. Cir. 1986) ("[W]here attorney misconduct is involved, this court has

been notably reluctant to affirm dismissal under the punishment or deterrence

rationale unless the client himself is shown to deserve the sanction."); *Carter v. City of

Memphis*, 636 F.2d 159, 161 (6th Cir. 1980) (per curiam).  But those cases have nothing

to do with whether the district court's coercive contempt order was appropriate here.

It plainly was not.

### B. The district court erroneously found Mr. Isihara personally responsible for violating the court's habeas order.

This Court's inquiry could stop there, but a response is also warranted to

amicus's defense of the district court's erroneous conclusions about Mr. Isihara's

responsibility for violations of the court's order.

Civil contempt must be based on "clear and convincing evidence" that the

alleged contemnor was aware of and violated a "clear and specific . . . order" that

required him to perform specific actions.  *See Wal-Mart Stores, Inc. v. Cuker Interactive,

LLC*, 27 F.4th 622, 624 (8th Cir. 2022); *International Bhd. of Elec. Workers, Loc. Union

---

[1] This Court has explained that sovereign immunity precludes compensatory contempt sanctions against federal officials acting in their official capacities.  *Coleman v. Espy*, 986 F.2d 1184, 1192 (8th Cir. 1993).

10

*No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002).  There is no dispute that the district court's habeas order obligated the government parties who were respondents in the habeas action to return petitioner's property.  *See* App.17, R. Doc. 6.  But again, that judgment imposed no personal obligations on government litigation counsel.  Indeed, amicus concedes (at 24) that ICE "had control over the property" and that Mr. Isihara "lacked direct control."  It follows that Mr. Isihara was unable personally to comply with the order to return petitioner's property—a "complete defense" to coercive contempt.  *United States v. Bryan*, 339 U.S. 323, 330-31 (1950).

Amicus asserts that "the district court made factual findings, supported by [an ICE witness's] testimony, that it was [Mr. Isihara's] inaction—failure to share the February 9 Order with anyone at ICE—that caused Petitioner not to receive his property by the deadline."  Amicus Br. 21.  As already discussed, any errors or missteps in the case before the district court entered its contempt order could not justify the court's coercive contempt order against Mr. Isihara:  there was no compliance due from him and thus nothing to coerce.  *See Jake's, Ltd.*, 356 F.3d at 903.  But even setting that aside, amicus cites nothing in the record that even colorably supports the district court's conclusion that Mr. Isihara was "primarily responsible" (Add.9, Hearing Tr., at 72) for ICE's noncompliance.  That finding was clearly erroneous.  *See* Opening Br. 22-23.

Appellate Case: 26-1327     Page: 15     Date Filed: 06/23/2026 Entry ID: 5653588

Amicus quotes the ICE witness's statement that he "did not know where Petitioner's property was because he 'was notified about the property issue about five minutes prior to the hearing.'" Amicus Br. 21 (quoting Hearing Tr., at 56). That might be probative if the ICE witness was the ICE official responsible for complying with the district court's order. But he was not. Rather, as the Civil Chief for the District of Minnesota explained, in the less than 24 hours that the district court provided before the show-cause hearing, the government was unable to identify the ICE official "responsible for Petitioner's custody, property, and release." Hearing Tr., at 14-15 (quotation marks omitted). The government instead provided a representative from the local ICE office who could "explain his understanding of what [he had] been able to figure out." Hearing Tr., at 15. That witness's own lack of personal knowledge says nothing about who was primarily responsible for the delay in delivering petitioner's possessions.

In fact, the record makes clear that ICE personnel in Texas, where petitioner was located at the time of the court's order, learned of the court's order in a timely fashion. The ICE witness testified, based on the results of his own investigation into the matter, that after petitioner's counsel notified ICE of the court's order, the matter was "reviewed internally" and eventually "reached the deportation officer that I believe was responsible for the case." Hearing Tr., at 52-53. And there is no dispute that petitioner was released shortly thereafter, within the deadline set by the district court.

12

Amicus's insistence that Mr. Isihara was nonetheless "'primarily responsible' for Petitioner's not having received his property by the court-ordered deadline," Amicus Br. 21 (quoting Add.9, Hearing Tr., at 72), rests on a convoluted set of inferences. According to amicus, the problem is that Mr. Isihara failed to timely convey the district court's order to ICE "through proper channels." Amicus Br. 20. That theory is both legally and factually baseless. It is legally baseless because a federal court generally has no authority to police or dictate the government's internal communication protocols, and the district court here did not purport to do so. The court's habeas order did not direct litigation counsel to provide notice to ICE in any particular way, and appropriately so. The theory is factually baseless because there is no record evidence whatsoever to support amicus's speculation that petitioner's property would have been found and returned sooner if only ICE had been notified by some different, unspecified bureaucratic route. A finding of contempt of court requires far more. *See Sisney v. Kaemingk*, 15 F.4th 1181, 1201 (8th Cir. 2021) (contempt is appropriate when there is "no fair ground of doubt as to the wrongfulness of [the alleged contemnor's] conduct with respect to" an order (quotation marks omitted)).

Amicus points to record testimony that "in the normal course, a Minnesota official would send instructions directing the detainee to be returned to Minnesota, along with the individual's property and file." Amicus Br. 26 (citing Hearing Tr., at 59-60). But the ICE witness immediately went on to state that "[s]ometimes aliens

13

arrive without their property, so then we go back and have to track that down," and "[a] lot of that's beyond the local officers' control, and there's various reasons why that may happen, but we follow through on that." Hearing Tr., at 60. It strains credulity that the failure to return petitioner's property immediately stemmed not from one of the "various reasons" that such things happen from time to time, but instead from the fact that the deportation officer received actual, timely notice of the court's order through an email chain originating with petitioner's counsel, rather than through a different chain originating with Mr. Isihara. The district court showed no interest in resolving any uncertainty in that regard. Although the ICE witness, after a break in the hearing during which he had time to gather more information, was able to identify a responsible person in Texas, Add.6-7, Hearing Tr., at 70-71, the district court made no effort to hear any testimony from people with first-hand knowledge, and instead simply declared that Mr. Isihara would be in civil contempt until ICE complied. That was error.

Amicus attacks a straw man in describing a "pass-the-buck" argument under which "ICE, though it had control over the property, could not be held responsible for an order [Mr. Isihara] never sent to ICE." Amicus Br. 24. The question of ICE's responsibility is not before this Court—and, as noted, answering that question would require an inquiry that the district court declined to pursue into the actual reasons for the failure to timely return the property. In all events, the government has never suggested that ICE would be excused from complying with a court order if it received

14

Appellate Case: 26-1327    Page: 18    Date Filed: 06/23/2026 Entry ID: 5653588

notice of the order from petitioner's counsel, instead of from government counsel. As the opening brief emphasized (at 28-29), the Department of Justice takes seriously the importance of complying with court orders, and Department attorneys—including Mr. Isihara, U.S. Attorney Rosen, and the many hard-working career professionals in the U.S. Attorney's Office for the District of Minnesota—expend great effort to communicate with federal agencies about the importance of complying with court orders and to assist agencies in construing orders to ensure compliance. Errors sometimes occur, and the government endeavors promptly to correct them when they happen. But in no event can a district court properly impose personal-capacity contempt fines on a government attorney out of frustration with his client agency's conduct. That is what happened here.

Amicus's remaining contentions are quickly dispensed with. Mr. Isihara's forthright, candid, and heartfelt apology for his earlier omissions resulting from the flood of other litigation he was handling was not by any stretch a concession that his actions caused ICE's non-compliance. *Contra* Amicus Br. 22-23 (arguing that Mr. Isihara admitted to causing non-compliance). And Mr. Isihara is not asking for any special rule for government attorneys. *Contra* Amicus Br. 26-27. As already noted, it would be equally extraordinary to impose personal liability on a private attorney for a client's non-compliance with an order of which the client had actual notice. Finally, amicus offers no defense of the district court's order attempt to punish Mr. Isihara and the U.S. Attorney's Office for perceived misconduct in other cases. Add.17-21,

15

Appellate Case: 26-1327    Page: 19    Date Filed: 06/23/2026 Entry ID: 5653588

App.12-16, R. Doc. 23, at 5-9; *see* Opening Br. 4-5; 29-30. There is no basis for imposing personal contempt on Mr. Isihara for conduct unrelated to the case at issue.

### C. The district court failed to give Mr. Isihara notice that he faced personal contempt.

The contempt order cannot stand for the additional reason that the district court failed to give notice to Mr. Isihara in advance of the hearing that he might face personal-capacity contempt. The district court thus deprived him of a meaningful opportunity to contest that sanction. *See FTC v. Neiswonger*, 580 F.3d 769, 774 (8th Cir. 2009).

The district court's show-cause order stated that a hearing would be scheduled "at which the Government must show cause, if any there be, why it should not be held in contempt for (1) failing to release Petitioner in Minnesota, as required by the Court's February 9 Order, (2) failing to return Petitioner's property to him, as required by the Court's February 9 Order, and (3) failing to timely provide a status update to the Court, as required by the Court's February 9 Order." App.15, R. Doc. 9, at 1. The order thus provided notice to "the Government" that "it" might face contempt for alleged noncompliance with the Court's habeas order. Nothing in the show-cause order suggests that the court was considering personal-capacity contempt sanctions against any specific individual, much less government litigation counsel.

Amicus entirely ignores the portion of the order stating that "the Government must show cause . . . why *it* should not be held in contempt." App.15, R. Doc. 9, at 1

16

(emphasis added).  It does not matter that, as amicus notes, the contempt order "required the appearance of the 'Assistant U.S. Attorney responsible for the management of [this] case.'"  Amicus Br. 28-29 (quoting App.16, R. Doc. 9 at 2 ¶ 2(a)).  The order actually required the appearance of either "David W. Fuller"—the Civil Chief in the District of Minnesota whose appearance had automatically been entered in the case—"or an Assistant U.S. Attorney responsible for the management of this case," along with "Petitioner's counsel" and an ICE representative.  App.16, R. Doc. 9 at 2; Hearing Tr., at 20-21.  In context, the order plainly meant to ensure that the attorneys handling the case, in addition to a representative of the party upon whom the court's order had imposed obligations, would attend the hearing.  That does not remotely suggest that a contempt proceeding against any individual was contemplated—much less that the court was considering holding Mr. Isihara, who was not named in the order at all, personally in contempt for the failure to return petitioner's property to him.  Mr. Isihara was thus denied notice.

That conclusion follows from this Court's cases.  This Court has squarely held that an order requiring attendance at a contempt hearing is not equivalent to notice of the possibility of contempt in an individual capacity.  *See In re Sanford L. Firm*, 106 F.4th 706, 719 (8th Cir. 2024).  In *Sanford Law Firm*, this Court held that an attorney had insufficient notice that sanctions were being considered against him personally when "[t]he show-cause order only required '[Sanford Law Firm] (*through its managing partner Josh Sanford*) . . . to show-cause . . . as to why *it* should not be *held in contempt of*

Appellate Case: 26-1327     Page: 21     Date Filed: 06/23/2026 Entry ID: 5653588

*court and sanctioned.*" *Id.* (third and fourth alterations in original). The show-cause order at issue here provided no better notice that personal contempt was being considered. Amicus does not address that aspect of *Sanford Law Firm*, instead discussing only the Court's separate point that the harshness of the sanctions required better notice to both the individual lawyer and the firm. *See* Amicus Br. 29.

Amicus pivots to the extraordinary argument that the district court provided adequate notice at the show-cause hearing itself by asking Mr. Isihara, on the spot, "[w]hy should I not hold you in contempt?" Amicus Br. 29 (quoting Hearing Tr., at 45). That is a strikingly impoverished concept of due process. As illustrated by *Sanford Law Firm* and similar cases, the whole point of notice in this context is to ensure that alleged contemnors do not face on-the-spot surprise contempt proceedings and that they have an opportunity, for example, to retain counsel and prepare a response. Although amicus argues (Amicus Br. 29) that "[u]nder applicable law, that was sufficient notice," the case cited for that proposition says nothing of the kind. In *U.S. S.E.C. v. Hyatt*, 621 F.3d 687 (7th Cir. 2010), the court of appeals held that due process "minimally includes a requirement that notice be given of the time and place of hearing on the propriety of a contempt order." *Id.* at 694 (quotation marks omitted). In that case, although the alleged contemnor was on notice that contempt was being pursued against it, there was inadequate notice that the issue would be considered at a particular hearing (which the alleged contemnor therefore did not attend), and the contempt finding was vacated on that basis. It is unclear how

18

amicus extracts from that discussion a holding that it is permissible for a court to ambush an individual attorney with a threat of personal-capacity contempt for the first time at a hearing. To the extent the case is relevant, it supports the opposite proposition.

Indeed, even after the statement on which amicus relies, Mr. Isihara seems reasonably to have believed that the court was considering holding *the government* in contempt, rather than issuing any kind of personal contempt sanction. Mr. Isihara responded by saying, "Your Honor, I think that to hold *us* in contempt would be to say that *we* basically acted with, like, total indifference and there was a total deviation from the expected standard of conduct, and not only that, but that *we -- we* were sort of willfully defying the court orders." Hearing Tr., at 45-46 (emphases added). This response suggests that Mr. Isihara did not understand the "you" in the court's question—"why should I not hold you in contempt"—to refer to him personally, as opposed to the government as a party, and that he understood the question to relate to criminal contempt rather than coercive civil contempt. In short, nothing about the facts and circumstances of this case suggests that Mr. Isihara received constitutionally adequate notice and a meaningful opportunity to be heard.

**D. Mr. Isihara did not forfeit his challenge to the contempt order.**

It follows *a fortiori* that Mr. Isihara cannot be held to have forfeited any arguments for failing to raise them before the district court. Amicus now suggests that Mr. Isihara's on-the-spot, uncounseled response at the hearing to an inquiry that

19

Appellate Case: 26-1327     Page: 23     Date Filed: 06/23/2026 Entry ID: 5653588

did not clearly relate to personal, coercive civil contempt should somehow limit the arguments he can advance in this Court. The error of that proposition should be self-evident. *Hyatt*, cited by amicus (at 29), rejected a similar argument. In *Hyatt*, the district judge had denied a motion to reconsider the contempt finding as moot on the ground that the alleged contemnor "had waived its opportunity to contest the contempt finding by failing to show up at the . . . hearing." 621 F.3d at 697. The court of appeals made short work of that argument, finding that the hearing notice did not provide sufficient notice that the court would take up the merits of the contempt issue and concluding that the contemnors had not forfeited a challenge to the contempt order not raised at the hearing.

None of the cases on which amicus relies suggests otherwise. To the contrary, *In re Grand Jury Proceedings*, 875 F.2d 927 (1st Cir. 1989), illustrates how far the district court in this case deviated from the proper procedures. There, the district court's show-cause order named two attorneys and stated that they should "show cause . . . why they should not be held in contempt." *Id.* at 929 (quotation marks omitted). At the hearing, the court asked whether the alleged contemnors "wished to be represented by counsel," and the court of appeals concluded that after receiving such notice and opportunity to be heard, the contemnors had forfeited arguments not raised in district court. *Id.* The possibility that individuals in that position can forfeit arguments by not raising them in the district court does not remotely suggest that an

20

individual who had no advance notice of the possibility of individual contempt should be limited to his on-the-spot reaction to an imprecise question.

Accordingly, there was no forfeiture. But if the Court concludes otherwise, given the "unusual circumstances" of this case, this Court should exercise its discretion to entertain the serious, and purely legal, arguments presented in this appeal. *See Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 891 (8th Cir. 2009) (explaining that the court has "discretion to consider an issue for the first time on appeal where the proper resolution [of that issue] is beyond any doubt . . . or when the argument involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case." (second alteration in original) (quotation marks omitted)).

### E. Amicus's jurisdictional arguments lack merit.

Finally, amicus's brief discussion of jurisdiction—echoing petitioner's motion to dismiss, which this Court denied—provides no basis for dismissing this appeal. Mr. Isihara's appeal presents a live controversy because he faces ongoing, concrete injuries from the district court's order.

Amicus does not address the cases cited in our opposition to the motion to dismiss, which explain the unique reputational harms associated with a formal reprimand of a litigating attorney. *See, e.g.*, *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1353 (Fed. Cir. 2003) (appeal from judicial reprimand is available "immediately"); *Sullivan v. Committee on Admissions & Grievances*, 395 F.2d 954, 956 (D.C. Cir. 1967) (district court's finding that an attorney was guilty of misconduct was

21

appealable); *In re Williams*, 156 F.3d 86, 92 (1st Cir. 1998) ("Words alone may suffice [to permit appeal of an order sanctioning an attorney] if they are expressly identified as a reprimand."). Nor does amicus explain why the contempt order at issue here, which constitutes a formal (and entirely unfair) determination that Mr. Isihara acted in contempt of a federal court order, would not give rise to the same reputational injuries. And although amicus attempts, in a footnote, to rebut one of the concrete practical harms threatened by the district court's order, amicus does not mention the others. *Compare* Amicus Br. 12 n.2 (dismissing possibility of investigation by the Department of Justice Office of Professional Responsibility) *with* Opp'n to Mot. Dismiss 11-12 (discussing Mr. Isihara's reporting requirements for military service, security clearance, and future bar membership). Even as to the possibility amicus discusses—investigation by the Department of Justice's Office of Professional Responsibility—amicus cannot seriously suggest that a holding by this Court that Mr. Isihara should not have been subject to a contempt order based on his client's noncompliance with a court order would be irrelevant to any such investigation.

Amicus relies primarily on the proposition that, as a general matter, where a contemnor chooses to comply with a coercive contempt sanction rather than contest its validity, any controversy is moot. *See, e.g.*, *United States v. Watson Chapel Sch. Dist. No. 24*, 446 F.2d 933, 939 (8th Cir. 1971) (appeal of coercive contempt was moot because "[t]he contemnor has seen fit to certify that he has disengaged from any activity violative of" the court order, rather than challenge the order). But those cases

22

are inapposite here: unlike the contemnor in each of those cases, Mr. Isihara made no voluntary decision to comply with, rather than challenge, the contempt order. That choice was denied to him altogether because, as we have discussed, the district court held him in contempt pending *ICE's* compliance with the habeas order, and Mr. Isihara had no ability either to compel or forbid that compliance. ICE's independent (and entirely appropriate) decision to comply with the court's order immediately should not render Mr. Isihara's personal appeal moot, because Mr. Isihara never made the critical choice that the mootness case law assumes. Indeed, the one other cited case that involved a sanction directed to an attorney, this Court's unpublished decision in *In re McGregory*, 223 F. App'x 530 (8th Cir. 2007) (per curiam), was resolved on the ground that the attorney himself could have sought a stay pending appeal and thus prevented his appeal from becoming moot. In those circumstances the court would "not consider the possible collateral consequences he faces to be recognizable exceptions to [the] rule of equitable mootness" that applies in bankruptcy proceedings. *Id.* at 532. That holding has no evident relevance here.

If the Court nonetheless concludes that it lacks jurisdiction over Mr. Isihara's appeal, it should treat the government's notice of appeal and briefs in this case as a petition for a writ of mandamus on behalf of the United States and direct the district court to vacate its contempt finding. The Court should provide clear guidance to courts in this Circuit that punishing attorneys personally for the conduct of their clients is an abuse of the contempt power. Amicus suggests (at 30), without

23

elaboration, that the United States has not complied with all the formalities of a writ of mandamus under Federal Rule of Appellate Procedure 21.  But "[o]f course, a federal court of appeals in its discretion may treat an attempted appeal from an unappealable order as a petition for writ of mandamus to prevent injustice."  *Williams*, 156 F.3d at 93 n.7.  And contrary to amicus's argument, the United States has no other mechanism for eliminating the threat to its attorneys of unwarranted contempt orders based on circumstances out of their control, and the district court's error was clear and indisputable for the reasons explained in the opening brief and above.

Lastly, amicus offers no response to the argument that, if this Court concludes it cannot decide the merits of the case because the controversy has become moot, the Court should "enter an order formally vacating the district court's orders to ensure that they do not have any ongoing consequences for Mr. Isihara."  Opening Br. 33-34. Because he had no ability to comply with the district court's order, Mr. Isihara should not be burdened with the consequences of the court's order for the rest of his career merely because the controversy became moot through no fault of his own.  *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950); *Panera, LLC v. Dobson*, 999 F.3d 1154, 1157 (8th Cir. 2021).

24

# CONCLUSION

For the foregoing reasons, the district court's order should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DANIEL N. ROSEN
*United States Attorney*

MARK R. FREEMAN
DANIEL TENNY

*s/ Jaynie Lilley*

JAYNIE LILLEY
*Attorneys, Appellate Staff*
*Civil Division, Room 7321*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3542*
*jaynie.lilley2@usdoj.gov*

June 2026

25

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,340 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Jaynie Lilley*
JAYNIE LILLEY

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jaynie Lilley*
JAYNIE LILLEY